NORMAN DRAPER and ALVA R. DRAPER, his wife, Plaintiffs Below-Appellants, v. OLIVERE PAVING & CONSTRUCTION Co., a corporation of the State of Delaware, and WILLIE M. REDDEN, Defendant Below-Appellee and Defendant Below.

(*May* 15, 1962.)

SOUTHERLAND, Chief Justice; WOLCOTT, Justice, and TERRY, President Judge, sitting.

*Courtney H. Cummings, Jr.* (of Killoran and Van Brunt) for appellants.

*Ernest S. Wilson, Jr.,* and *William T. Lynam, III,* for appellee.

Supreme Court of the State of Delaware, No. 5, 1962.

WOLCOTT, J.:

This is an appeal from the entry of summary judgment in favor of the defendant Olivere Paving & Construction Co. (hereafter Olivere). The action grew out of an assault and battery committed upon the plaintiff, Norman Draper (hereafter Norman), by the defendant, Willie M. Redden (here

after Willie), at the time an employee of Olivere. The plaintiff, Alva R. Draper, wife of Norman, sues for loss of consortium.

Plaintiffs advance four theories in support of their action, *viz.*:

(1) That the assault and battery by Willie against Norman occurred within the general scope of Willie's employment;

(2) That since Olivere contracted with the City of Wilmington to reconstruct a public street, it, by reason of that fact, owed the affirmative duties to exercise a high degree of care and take all necessary precautions for the safety of the public, and that as a result of Olivere's breach of these duties, Norman suffered injuries;

(3) That Olivere was negligent in hiring and keeping Willie in its employment because of his vicious and malicious nature, which was known to Olivere;

(4) That Olivere, with full knowledge, ratified Willie's assault and battery upon Norman as being within the general scope of Willie's employment.

We state the facts. Such statement must of necessity be in the light most favorable to plaintiffs' contentions since summary judgment was entered against them.

Olivere entered into a contract with the City of Wilmington for the reconstruction of a city street, North Park Drive from Market Street west to the plant of the Container Corporation. This length of North Park Drive is intersected at approximately its middle point by Van Buren Street. The contract required Olivere to provide safe vehicular travel in at least one traffic lane at all times during construction. Olivere was further required by the contract to erect and maintain sufficient barricades, warnings, signs, etc., and to provide watchmen for the protection of the public. In the

event it was necessary to close the street to traffic, Olivere was required to erect barricades with warning signs, and to erect and maintain sufficient detour signs around the closed-off street.

Olivere commenced the reconstruction of the street. Apparently, pursuant to the contract, Olivere completed first the reconstruction of North Park Drive westerly from Van Buren Street to the plant of the Container Corporation. Reconstruction of the section lying easterly between Van Buren Street and Market Street was then commenced. Due to the physical nature of this section it proved impracticable to keep one lane of traffic open through it during construction. This section was, accordingly, closed to traffic. Barricades and a detour sign were placed, closing off this section of North Park Drive at its intersection with Van Buren Street. In addition, on occasion, a member of the Wilmington Park Police was on duty at the barricade to direct traffic. However, at the time of the incident with which we are involved, no Park Policeman was on duty.

In the afternoon of September 10, 1959, Norman drove his car, followed by a car driven by his father, Lloyd, accompanied by Norman's son, across Van Buren Street Bridge intending to turn right and proceed easterly on North Park Drive. At this time the barricades and a detour sign had been pushed aside to the left and completely off the repaved surface of North Park Drive. (This fact is in dispute but we accept the plaintiffs' version as did the trial judge.) At this time there was no watchman at this intersection.

Norman, followed by Lloyd, proceeded easterly on North Park Drive to a point under Washington Street Bridge, at which point Willie, then in the employ of Olivere, was operating a road grader on the shoulder of the road. He waved them down since North Park Drive was impassable to traffic from that point on.

Willie's profane remarks to Norman and his father were to the effect that, like everyone else, the Drapers ignored signs and barricades. Thereupon, Norman and Lloyd started to back their cars to turn around, accompanied by remarks from Willie concerning the stupidity of people in ignoring barricades. Lloyd experienced difficulty in backing and got out of his car to see if he had room enough to turn around. Willie's tirade continued and Lloyd called to him and said to come on back and he would show him that the barricades had been pushed aside. At this, or possibly when Lloyd got out of his car, Willie left the grader and walked rapidly toward Lloyd, telling him to "get back in your damned car or I will push your face in." Thereupon, there was an exchange of unpleasantries between Lloyd and Willie.

Norman got out of his car, whereupon Willie changed direction and came toward him. An exchange of cursing and obscenity then took place between Norman and Willie, including slurring references to their respective racial characteristics. The whole fracas resulted in Willie administering a grievous slashing across the neck to Norman with a corkscrew he took from his pocket. It is not clear whether or not blows were exchanged between them, or as to which one struck the first blow. In any event, Norman was seriously injured and was taken immediately to a hospital.

It seems apparent that this entire argument and violence took place within a very short space of time. Lloyd estimated that "it wasn't over a minute" from the time Willie got off the grader until he slashed Norman. Again, he described the time duration by snapping his fingers.

Willie was thereafter arrested for assault and battery and sentenced to six months imprisonment. Olivere posted bail for him and one of its officials was instrumental in his release on probation. Willie served no time in jail but immediately returned to his job with Olivere for which he had worked

from 1944 until his death subsequent to the filing of this lawsuit, and the taking of his deposition.

Prior to coming to Delaware in 1940, Willie was a resident of Georgia where, in 1933, he was convicted of the crime of murder, and sentenced to life imprisonment. He was pardoned in 1939. He came to Delaware shortly thereafter. After settling in Delaware, Willie got in trouble with one Hall, a fellow employee. The difficulty apparently arose out of a domestic situation involving Willie's wife, and involved an attempted assault by Willie on Hall with a knife. It seems clear that Olivere knew nothing of Willie's conviction of murder in Georgia, but it may have known of the subsequent attempted assault on Hall. In any event, Olivere considered Willie a "key man" on the job and was anxious for him to continue in its employ.

There seems to be no doubt that, while it was not the particular job of Willie to direct traffic, any employee of Olivere was authorized and expected to direct traffic in a situation such as the one here at bar.

Upon these facts and upon the assumptions that there were in fact no barricades at the intersection of Van Buren Street and North Park Drive, and that Willie was the aggressor in the described assault and battery, the trial judge held that the assault did not take place within the scope of Willie's employment and, accordingly, entered summary judgment in favor of Olivere, leaving the estate of Willie as the sole defendant.

Initially, we note one matter which is not raised in this appeal. Alva Draper, the wife of Norman, sues in this action for loss of her husband's consortium. On the authority of *Yonner v. Adams*, Del. Super., 167 A. 2d 717, a recent decision of the Superior Court, the trial judge held that a wife is entitled to recover for loss of consortium, but that such right of action was dependent upon the husband's right to

maintain an action for personal injuries. The correctness of the *Yonner* decision is not before us and, consequently, this opinion is not to be read as either an implied approval or disapproval of that decision.

■ We consider first the argument of Norman to the effect that Olivere assumed responsibility for Willie's tort by ratification. The argument is that, in arranging for bail and probation, and taking him back in his employ, Olivere ratified his act. The trial judge held that the record failed to support this theory. With this holding, we agree. The furnishing of bail and assistance to obtain probation do not, of themselves, establish acquiescence in and ratification of the criminal acts of an employee to such an extent as to subject the employer to civil liability. We think such acts exhibit solely the desire of an employer to get a highly-trained workman back on a job then in progress.

■ Secondly, Norman argues that Olivere was negligent in hiring Willie knowing him to have a vicious and malicious nature. The record wholly fails to support the charge. It is not clear that Willie was a principal in the murder for which he was convicted in Georgia. His own explanation was that he had loaned to another the gun which was used as the murder weapon, and his subsequent pardon would seem to bear this out. Furthermore, there is no proof whatsoever that Olivere ever knew of this past conviction. Bearing upon Olivere's knowledge, also, is the important fact that Willie, for seventeen years, had been a faithful, able workman who, for that period, had stayed out of trouble. We agree with the trial judge that the charge is unsupported.

■ Thirdly, Norman argues that Olivere, by reason of its contract with the City of Wilmington, was under the duty of exercising a high degree of care and taking all necessary precautions for the safety of the public, and that he was injured by reason of a breach of this duty. We think, however that the breach of the terms of the contract relied upon

could not be considered to be the proximate cause of the injuries complained of. There is no doubt but that the assault by Willie caused these injuries. If Olivere is liable for the result, that liability springs not from any term of the contract but from the common law liability of a master for the torts of his servant perpetrated in the course or scope of his employment.

We will assume, as did the trial judge, that Norman, his father and son, did not pass through barricades erected on North Park Drive, and that they did not ignore signs or warnings not to proceed. This assumption, we think, places them legally at the place where the assault took place. We make this assumption, but we caution that these facts are in dispute between the parties and must be resolved, if at all, upon trial.

We will further assume, as did the trial judge, that Willie was the aggressor in the assault upon Norman. We again caution, however, that this factual conclusion is in dispute, and must be resolved, if at all, upon trial.

These two assumptions leave only one issue remaining upon the question of the liability of Willie's employer, Olivere. If Willie's tort was committed within the scope of his employment, then his employer is liable. We therefore take up this question which we think is the serious one in this appeal.

Increasingly, today the tendency of the law is to impose a vicarious liability upon a master for the torts of his servant committed in the course of his employment. At early common law this was not so, but commencing in the 18th Century expanding commerce and industry gave the impetus to an expansion of the master's responsibility for the torts of his servant. A variety of reasons have been given by the courts for the imposition of this expanded concept of liability but, in reality, it is a matter of policy. Thus, losses caused by torts of the servant more or less certain to occur in the conduct of the master's business as a matter of policy are placed upon the

master because he is better able to bear them. Furthermore, the imposition of such liability acts as an incentive to the master to cause his business to be conducted with due regard to the safety of others. *Prosser on Torts* (2nd Ed.), § 62; 35 *Am. Jur.*, Master & Servant, § 543, and *Restatement of Agency* (2nd), § 219, comment *a*.

However, liability for the torts of the servant is imposed upon the master only when those torts are committed by the servant within the scope of his employment which, theoretically at least, means that they were committed in furtherance of the master's business. In the imposition of that liability, furthermore, it makes no difference whether the tort is one of negligence only, or whether the tort is intentional or willful. *Prosser on Torts* (2nd Ed.), § 63; *Restatement of Agency* (2nd), § 245. With this statement of the law, we think the parties to this cause do not disagree.

When it is sought to apply the law to the facts of the case at bar, however, sharp disagreement arises. That disagreement arises upon the question of whether or not the assault of Willie upon Norman took place within the scope of his employment. Olivere would have us apply the rule most strictly, while Norman would have us expand its embrace so as to make Olivere a practical insurer against the torts of its employees. The answer is not without difficulty.

The phrase, "scope of employment", is at best indefinite. It is nothing more than a convenient means of defining those tortious acts of the servant not ordered by the master for which the policy of law imposes liability upon the master. The phrase, itself, contains no guide for its application. However, it certainly includes acts of the servant so closely connected with what he is employed to do, so fairly incidental to it, that they are to be regarded as methods elected by the servant, even though improper, of carrying out the master's business. *Prosser on Torts* (2nd Ed.) § 63, p. 352. In different language, but we think with the same

meaning, the *Restatement* would impose liability upon the master for his servant's intended tortious harm "if the act was not unexpectable in view of the duties of the servant." *Restatement of Agency* (2nd), § 245.

The problem of determining whether or not a particular tortious act was one performed within the scope of the servant's employment for which the master consequently is liable is one which, of necessity, can be answered only in the light of the particular circumstances of the case under consideration. The question is ordinarily one for decision by the jury, unless the contrary is so clearly indicated by the facts that the court should decide it as a matter of law. *Restatement of Agency* (2nd), § 228, comment *d*. Since judgment was summarily entered for Olivere in this case, it follows that in the belief of the trial judge the factual version most favorable to the plaintiffs was, as a matter of law, inconsistent with the conclusion that Willie's tort was committed within the scope of his employment. It follows, therefore, that we must examine these facts to determine whether or not reasonable men could differ upon this. If such a possibility exists, then the question becomes one to be submitted to a jury for decision.

In the *Restatement of Agency* (2d), § 228, it is laid down that the conduct of a servant is within the scope of his employment if (1) it is of the kind he is employed to perform; (2) it occurs within the authorized time and space limits; (3) it is activated, in part at least, by a purpose to serve the master; and (4) if force is used, the use of force is not unexpectable by the master.

Many factors enter into the decision as to whether or not a particular tort was committed by a servant within the scope of his employment. They are set forth in *Restatement of Agency* (2nd), § 229(2) and in *Prosser on Torts* (2nd Ed.), § 63. Those which seem pertinent to the case at bar are: (1) whether the act is one commonly done by such servants;

(2) the time, place and purpose of the act; (3) whether or not the act is outside the enterprise of the master; (4) whether or not the master has reason to expect that such an act will be done; (5) the similarity in quality of the act done to the act authorized; and (6) the extent of departure from the normal method of accomplishing an authorized result.

Considering, then, the facts as shown in the present record in the light most favorable to the plaintiffs, as we must do, we think the following circumstances could be found by a jury.

Willie was the servant of Olivere and had been such for upwards of seventeen years. He was in fact a trusted servant. His employment consisted primarily in the operation of heavy equipment upon road construction work. As such, it was not one of Willie's primary duties to direct traffic around or through the site of one of Olivere's construction jobs, but, as with all of Olivere's employees, Willie was expected to, and in fact did direct such traffic when the occasion arose.

On the day in question, Willie was operating a road grader on one of Olivere's jobs at a point beyond which traffic could not pass because of freshly poured cement. At this time the plaintiff, Norman, followed in another car by his father, Lloyd, drove up to the point where Willie was working. They did this in the belief that they could drive on through because the signs warning otherwise had been pushed to one side.

Upon seeing the two cars, Willie, believing that the warning signs were still in place, became angry and shouted to Norman and Lloyd, telling them to go back, and cursed them for stupidity. Norman and Lloyd started to back their cars to turn around and Willie continued his verbal abuse of them and their intelligence.

Lloyd got out of his car to see if he had room to back up and turn. Willie thereupon jumped off his grader and

moved rapidly toward Lloyd, telling him to get back in his car or he would push his face in. As Willie approached Lloyd he cursed him and continued to make disparaging references to people who disregarded signs. Lloyd answered back and Willie made a movement as though to draw a knife. Norman then stepped out of his car and asked Willie if he had a knife. Whereupon, Willie turned, addressed a foul and obscene epithet to Norman who may or may not have replied with an epithetical reference to Willie's race. Willie thereupon advanced upon Norman and slashed him severely across the neck with a corkscrew he had taken from his pocket.

The lapse of time between Willie jumping from his grader and slashing norman was less than a minute.

As we say, if a jury accepted *in toto* the testimony of Norman and Lloyd, the above recital of facts could be found to be the true ones. It is only fair to add, however, that in some important particulars these facts are controverted by the defendants.

From the facts recited, however, it will be obvious that at least part of the tests to determine if particular conduct is within the scope of employment laid down in *Restatement of Agency* (2nd), § 228, has been met without question. Thus, Willie was employed, *inter alia*, to direct traffic. This, he did. This occurred during Willie's working hours and on the site where he was then employed. The act of telling Norman and Lloyd to go back was in performance of Olivere's business, and, indeed, from the recital of fact given, his descent from the grader must be assumed to have been for the same purpose.

The only element about which there can be any real debate is whether or not Willie's use of intentional force was expectable by Olivere. As to this, we think men might differ. Certainly, there is nothing in this record to throw any light whatsoever on the question of whether or not the use

of force by traffic directors on construction jobs is so rare as to be unexpectable. If there is any proof to that effect, it was encumbent upon Olivere as the moving party to produce it. *Ebersole v. Lowengrub, Del.*, 180 *A*. 2d 467. Indeed, the many reported decisions in other jurisdictions involving the use of excessive force by watchmen, guards, etc., would lead one to believe that the use of force in such situations is not entirely unexpectable.

To be sure, Willie used grossly excessive force upon Norman, but the use of excessive force as well as the question of expectability of the use of any force are matters of fact to be decided by the trier of fact in the light of the circumstances of the individual case. *Restatement of Agency* (2nd), § 245, comments *a* and *c.*

We think the question of whether or not Willie at the time of his assault upon Norman was engaged in the performance of a part of his duties, and whether the use of force under the circumstances was not entirely unexpectable are close ones. Similarly, it is a close and difficult question of fact as to whether the assault upon Norman was entirely the product of Willie's anger, which arose independently of his performance of the duties of his employment, or whether it occurred while Willie was in fact in the performance of his duties, and was motivated at least in part by the desire to serve his master's interests. These are close and difficult questions. They are not for the decision of the judge as a matter of law, but are questions to be determined by the jury, a cross-section of the public especially adapted to judge the actions of people in the light of what is reasonable. *Robelen Piano Co. v. Di Fonzo, Del.*, 169 *A*. 2d 240.

Our conclusion in this respect is supported by many reported decisions in other jurisdictions. Reference to only a few will suffice to demonstrate. Thus, in *Simmons v. Kroger Grocery & Baking Co.*, 340 *Mo.* 1118, 104 *S. W.* 2d 357, it was held that the jury must determine whether or not a clerk

chasing small boys from his employer's store windows on Halloween was still acting within the scope of his employment when, after chasing them for several blocks, he caught one and committed an assault and battery upon him.

In *Chicago, etc. Ry. Co. v. Carter* (Tex. Com. App.), *261 S. W.* 135, it was held that the jury must determine whether or not a crossing guard in an altercation with a teamster was still acting within the scope of his employment when he shot and killed the teamster as the culmination of the argument.

In *New Ellerslie Fishing Club v. Stewart*, 123 *Ky.* 8, 93 *S. W.* 598, 9 *L. R. A., N. S.*, 475, it was held that when an agent begins a quarrel while acting within the scope of employment and in the course of that quarrel commits a violent assault, the law cannot determine when in the course of the quarrel he ceased to act as a servant and permitted his own personal animosity to take over. It was a question for the jury.

In *Thompson-Starrett Co. v. Heinold*, 3 *Cir.*, 60 *F.* 2d 360, it was held that the master was liable for the wanton and malicious act of the servant if committed within the scope of his employment, and the determination of whether or not the tort was committed in the course of employment was for the determination of the jury.

In *Osipoff v. City of New York*, 286 *N. Y.* 422, 36 *N. E.* 2d 646, it was held that whether or not the tort of a servant is committed within the scope of employment is a question of fact to be left to the decision of the jury.

In *Ogilby v. Eskey* (D. C. Mun. App.), 121 *A.* 2d 265, the question of whether or not a delivery boy making a delivery in an office building who became engaged in an altercation with the elevator starter and committed a violent assault upon him was then acting within the scope of his employment presented a proper question for the jury's decision.

In *Schisano v. Brickseal Refractory Co.*, 62 *N. J. Super.* 269, 162 *A.* 2d 904, aff'd 33 *N. J.* 323, 164 *A.* 2d 602, in a suit arising from the death of one struck during an altercation by the defendant's employee, it was held that when the scope of the servant's employment is a disputed question of fact, that question is to be decided by the jury.

In *Smith v. Bosco*, 126 *N. J. L.* 452, 19 *A.* 2d 637, a watchman at a bridge became engaged in an argument with a man who parked his vehicle in an unauthorized place and finally stabbed him. It was held that there was a jury question presented as to whether or not the assault was committed within the scope of the watchman's employment.

To the same effect are *Bryce et al. v. Jackson Diners Corp.*, 80 *R. I.* 327, 96 *A.* 2d 637, and *Gindin v. Baron,* 16 *N. J. Super.* 1, 83 *A.* 2d 790.

Olivere cites many cases to us in support of his position. We will not review them in detail. It is sufficient to say that those which apparently favor his argument are cases in which there were no facts which would support a conclusion that the assailant was acting within the scope of his employment. To the extent that several would apparently deny liability because of the excessive violence employed by the servant, even though that violence was precipitated by the attempt to carry out the master's business, we think they are flatly contrary to the view expressed by us to the effect that if a servant elects to perform his duties by the use of unauthorized violence, the master will be liable if the violence is not unexpectable, and if it is used to carry out the duties of the employment. We, accordingly, refuse to follow them.

The case upon which Olivere primarily relies, which we think typical of his authorities, is *Park Transfer Co. v. Lumbermens Mutual Casualty Co.*, 79 *U. S. App. D. C.* 48, 142 *F.* 2d 100. That case, however, we think is clearly distinguishable from the case at bar. The facts in *Park Transfer* were

that two workmen employed by different contractors were involved. Both were working on the same general job. One, Smith, sought to drink from a pail of water belonging to the other, Jett. Jett, with a slighting reference to the race of Smith, told him to stay away from the pail. At this, Smith killed Jett by striking him over the head with a piece of pipe. It was held that the death was not caused while in the scope of Smith's employment. The cases are clearly distinguishable for in the *Park Transfer* case Smith was not furthering the business of his employer by trying to drink from the pail of Jett.

In the case at bar, the facts taken most favorably to the plaintiffs show a continuous course of action which commenced initially at least with the carrying out by Willie of the duties for which he had been hired. One possible view is that, without any intervening cause, Willie proceeded to carry out those duties in an increasingly violent manner. On the other hand, it would be possible for the jury to conclude that Willie's anger and violence were caused by insulting reference to his race, and that the ultimate assault upon Norman was due to an independent and unrelated motive, *viz.*, his anger. If such were the case, then the jury could conclude that the connection between the master, Olivere, and the servant, Willie, had been broken. The events, according to one view of the evidence, however, were continuous, and it is therefore impossible to say as a matter of law that the connection was unbroken.

In any event, there is conflicting evidence as to what the precise facts were. That circumstance, if no other, requires us to reverse the summary judgment entered in Olivere's favor.