# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| MARY DOE,<br><br>        Plaintiff,<br><br>        v.<br><br>MASSAGE ENVY FRANCHISING, LLC;<br>DDW ENTERPRISES, LLC; RED<br>ENTERPRISES, INC. D/B/A MASSAGE<br>ENVY—REHOBOTH BEACH AND<br>D/B/A MASSAGE ENVY—LEWES; and<br>RICHARD DULEY,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. S20C-05-005 RHR<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Submitted: March 6, 2024
Decided: June 28, 2024

Upon Defendant Massage Envy's Motion to Dismiss,
GRANTED in part and DENIED in part.

## MEMORANDUM OPINION

Lauren A. Cirrinicione, Esquire, Philip T. Edwards, Esquire, Murphy & Landon, Wilmington, Delaware; V. Paul Bucci, II., Esquire, Brian D. Kent, Esquire, M. Stewart Ryan, Esquire, Brian D. Kent, Esquire, Laffey, Bucci, & Kent, LLP, Philadelphia, Pennsylvania, *Attorneys for Plaintiff Mary Doe*.

Shannon D. Humiston, Esquire, Hayley J. Reese, Esquire, McCarter & English, LLP, Wilmington, Delaware; Bradley D. Schwer, Esquire, Lorena Van Assche, Esquire, Nicole Stewart, Esquire, Matthew St. Martin, Esquire, Thorpe Schwer, P.C., Phoenix, Arizona, *Attorneys for Defendant Massage Envy Franchising, LLC*.

Penelope B. O'Connell, Esquire, O'Hagan Meyer PLLC, Wilmington, Delaware, *Attorney for Defendants Red Enterprises, Inc. and Richard Duley*.

ROBINSON, J.

Defendant Massage Envy Franchising, LLC filed a motion to dismiss all counts of Plaintiff's First Amended Complaint ("Complaint"). The Complaint alleges that Plaintiff was a customer at a Massage Envy location in Rehoboth Beach, Delaware, where she was sexually assaulted during a massage by an employee of the franchisee. For the following reasons, the motion to dismiss is DENIED in part and GRANTED in part.

## FACTUAL BACKGROUND

### A.    The Parties

Mary Doe ("Doe") is an adult female and Delaware resident. She is referred to with a pseudonym to protect her privacy.

There are four defendants remaining.

Massage Envy Franchising, LLC ("MEF")[1] is a Delaware[2] limited liability company with its principal place of business in Scottsdale, Arizona.[3] MEF is a franchisor that licenses its business name, business model, trademark, and proprietary knowledge to its franchisees through a franchise agreement. The Complaint claims that MEF is the largest operator of chain massage franchises in

---

[1] Throughout this decision, "MEF" will be used to refer to the corporate entity that is a party to this suit. "Massage Envy" will be used generally to refer to the individually owned MEF franchise locations that share the name "Massage Envy."

[2] The Complaint states that MEF is an Arizona corporation, but in several places in its responsive filings, MEF states it is a Delaware company.

[3] Am. Compl. ¶ 3.

the country, having over 1,200 locations nationwide serving approximately 1.65 million members.[4]

DDW Enterprises, LLC ("DDW") is a Texas corporation registered to do business in Delaware.[5] DDW has its principal place of business in Texas.[6] At all times relevant to this case, DDW served as the corporate entity for MEF and Massage Envy Franchise locations throughout Pennsylvania and Delaware, including the one patronized by Doe.[7]

Red Enterprises, Inc. doing business as "Massage Envy – Rehoboth Beach" and "Massage Envy – Lewes" ("MERB") is a Maryland corporation, with its principal place of business is in Sussex County, Delaware.[8] MERB operates as a franchisee of MEF.[9]

Richard Duley ("Duley") is an individual who served as officer and/or director of MERB at all times relevant to this case.[10]

## B.    The Franchise Agreement

MEF requires franchisees to sign a written franchise agreement upon application and approval to own and operate Massage Envy locations.[11] MEF and

---

[4] *Id.* ¶ 13.
[5] Am. Compl. ¶ 4.
[6] *Id.*
[7] *Id.*
[8] *Id.* ¶ 6.
[9] *Id.*
[10] *Id.* ¶ 7.
[11] *Id.* Ex. A (hereinafter the "Franchise Agreement").

MERB executed a written franchise agreement ("Franchise Agreement") when establishing the Massage Envy franchise in this case.[12] The Franchise Agreement is a lengthy document that contains detailed requirements and restrictions MERB must abide by while operating a Massage Envy franchise.[13] The Franchise Agreement also makes reference to additional controlling documents such as the Operations Manual, Code of Conduct, and Handling and Reporting Policy contained in the System Standards.[14] Failing to operate a Massage Envy franchise in accordance with the Franchise Agreement provides MEF the right to terminate the agreement.[15] Included below are relevant excerpts from the Franchise Agreement detailing some aspects of the franchisee-franchisor relationship.

> We (and any affiliates that we might have from time to time) shall at all times have the right to engage in any activates we deem appropriate that are not expressly prohibited by this Agreement, whenever and where we desire, including, but not limited:
>
> - o Establishing and operating Massage Envy Locations, and granting rights to other persons to establish and operate Massage Envy Locations, on any terms and conditions we deem appropriate and at any locations other than within the territory.[16]
>
> …
>
> You agree that you will conduct your business as to generate minimum Gross Sales of not less than (i) Four Hundred Seventy-Five Thousand Dollars ($475,000.00) during any twelve (12) month period after the opening of your Business for a Total Body Care Location and (ii) Three Hundred Fifty Thousand Dollars ($350,000.00) during any twelve (12)

---

[12] *Id.* ¶ 25.
[13] *See* Franchise Agreement.
[14] *Id.* at Sec. 14.A, B(12), B(20).
[15] *Id.* at Sec. 14.
[16] *Id.* at Sec. 14.D(1).

month period after the opening of your Business for a Satellite Location. Your failure to generate such level of Gross Sales during any twelve (12) months of operation shall afford us the right to terminate this Agreement or, in lieu of such termination, to require you to operate your Business under an approved recovery plan and to improve the performance of your Business.[17]

…

Before your Business opens, you will be provided approximately three (3) weeks of initial training (approximately fifteen (15) training days) on the operation of a Massage Envy Location for your Managing Owner (defined in Section 8.A), your Business Manager and up to three (3) of your management personnel. The initial training program will include approximately one (1) week of classroom training at our corporate headquarters and approximately two (2) weeks of on-site training (approximately ten (10) days) at your Site or an operating Massage Envy Location. Our supplier, Murad, Inc., PCA Skins (or any other supplier we designate), may conduct certain portions of on-site training relating to facials and related products and services. If your Business is located in an area serviced by a Regional Developer (defined in Subsection 12.A), then the Regional Developer shall provide the on-site training to you. Your Managing Owner, your Business Manager (defined in Section 8.A) and the number of additional management personnel we designate must complete the initial training program to our satisfaction and participate in all other activities we require before opening your Business. Although we provide the initial training program at no additional fee, you must pay all travel and living expenses that you and your personnel incur.

In the event that your Managing Owner fails to satisfactorily complete and pass the required initial training program, then we reserve the right, in our sole discretion, to require your Managing Owner (or a successor Managing Owner that you appoint and we approve) to attend additional training and we will charge you an additional training fee of Two Hundred Fifty Dollars ($250.00) per day per person. If your Managing Owner is unable to satisfactorily complete and pass that initial training program, we reserve the right, in our sole discretion, to terminate this Agreement.[18]

---

[17] *Id.* at Sec. 3.C.
[18] *Id.* at Sec. 4.A.

…

We will advise you from time to time regarding your Business' operation based on your reports or our inspections. We will provide guidance to you in our operating manual and other technical manuals ("Operations Manual"); in bulletins or other written materials; by electronic media; by telephone consultation; and/or at our office or your Business. If you request and we agree to provide additional or special guidance, assistance or training, you must pay our then applicable charges, including our personnel's per diem charges and any reasonable travel and living expenses. Notwithstanding for [sic] foregoing, you are responsible for the terms and conditions of employment of your employees.[19]

…

We will provide access to you, to use in operating your Business during this Agreement's term, one (1) copy of our Operations Manual, which might be or include audiotapes, videotapes, computer disks, compact disks and/or written or intangible materials and which may be available to you by various means, including access through the Internet. The Operations Manual contains mandatory and suggested specifications, standards, operating procedures and rules that we periodically prescribe from operating a Massage Envy Location and information on your other obligations under this Agreement ("System Standards") in order to help us ensure, among other things, that the Massage Envy brand is consistently operated by all franchisees within the Franchise System and because we have a legitimate interest in protecting the quality of the products and services offered at Massage Envy Locations and the goodwill of our Marks and all Massage Envy Locations are preserved. The Operations Manual is incorporated by reference into this Agreement and is a binding part of this Agreement. We may modify the Operations Manual periodically to reflect changes in the System Standards. You agree to keep your copy of the Operations Manual current and in a secure location at your Business facility. If there is a dispute over its contents, our master copy of the Operations Manual controls. You agree that the contents of the Operations Manual are confidential and that you will not disclose the Operations Manual to any person other than your employees who need to know its contents. You may not at any time copy, duplicate, record or otherwise reproduce any part of the Operations Manual. With the exception of policies

---

[19] *Id.* at Sec. 4.C.

regarding inappropriate conduct and minimum requirements for managers, massage therapists and estheticians, any personnel policies or procedures which are made available in the Operations Manual are for your optional use and are not mandatory. You shall determine to what extent, if any, such personnel policies and procedures may be applicable to your Business operations in your jurisdiction. You and we recognize that we neither dictate nor control labor and employment matters for you and your employees.[20]

…

Concurrently with the execution of this Agreement, you shall designate one of your Owners who holds at least a 20% ownership interest in the franchise to serve as the managing owner (the "Managing Owner") of your Business as described in this Agreement. The Managing Owner will exert full-time efforts to manage and supervise the operations of your Business and will not engage in any other business or other activity, directly or indirectly, that may conflict with your obligations under this Agreement. The Managing Owner must successfully complete our initial training program before the opening of your Business. Any substitute Managing Owner must also complete our initial training program.[21]

…

To the extent permitted by applicable law, we may periodically establish maximum and/or minimum prices for services and products that your Business offers, including, without limitation, prices for promotions in which all or certain Massage Envy Locations participate.[22]

…

You acknowledge that compliance with the entirety of the System Standards is essential for the success of your Business. In addition, you acknowledge and agree that operating and maintaining your Business according to the mandatory System Standards is essential to preserve the goodwill of the Marks and all Massage Envy Locations. Therefore, you agree at all times to operate and maintain your Business according to each and every System Standard, as we periodically modify and supplement them. Except as otherwise specifically described in Section 4.D, System Standards may regulate certain necessary aspects of the

---

[20] *Id.* at Sec. 4.D.
[21] *Id.* at Sec. 8.A.
[22] *Id.* at Sec. 8.G.

6

operation and maintenance of your Business, including but not limited to any one or more of the following:

- o employee dress and appearance, although you have sole responsibility and authority for your employees' terms and conditions of employment and employee practices;[23]

- o minimum licensing, certifications, educational background, credentials and skill levels of massage therapists and aestheticians performing services at your Business;[24]

- o customer service standards and policies;[25]

- o participation in market research and testing and product and service and development programs;[26]

- o bookkeeping, accounting, data processing and record keeping systems and forms; formats, content and frequency of reports to us of sales, revenue, and financial reports and condition; and giving us copies of tax returns and other operating and financial information concerning the Franchise;[27]

- o any violation of the Code of Conduct Violation, Handling and Reporting policy as set forth in our Operations Manual;[28] and

- o any other aspects of operating and maintaining your Business that we determine to be useful to preserve or enhance the efficient operation, image or goodwill of the Marks and Massage Envy Locations. However, the System Standards are not intended to be used by us to control or manage your Business on a day to day basis, which is your responsibility.

You agree that all mandatory System Standards we prescribe in the Operations Manual, or otherwise communicate to you in writing or

---

[23] *Id.* at Sec. 8.J(3).
[24] *Id.* at Sec. 8.J(4).
[25] *Id.* at Sec. 8.J(8).
[26] *Id.* at Sec. 8.J(10).
[27] *Id.* at Sec. 8.J(12).
[28] *Id.* at Sec. 8.J(14).

7

another form, are part of this Agreement. All references to this Agreement include all mandatory System Standards as periodically modified. Subject to your rights under Section 8.B relating to substantial alterations to the appearance, layout and/or design of your Business' facility and/or replacement of a material portion of your Operating Assets, you acknowledge that our periodic modification of our System Standards (including, without limitation, changes to the Computer System's components), which may accommodate regional and/or local variations, may obligate you to invest additional capital in your Business and incur higher operating costs, and you agree to comply with those obligations within the time period we specify. If (i) we notify you of a failure to comply with our System Standards and you fail to correct the non-compliance within the period of time that we require, then, in addition to any other remedies available to us under this Agreement (including, but not limited to, termination of this Agreement) or (ii) after committing a default under the Franchise Agreement, you commit the same default under the Franchise Agreement within 6 months, we may impose a fine of up to $500 per occurrence. Our collection of a fine for an uncured breach of any System Standard shall not preclude us from subsequently terminating this Agreement at any time that the breach remains uncured.[29]

…

You agree to establish and maintain at your own expense a bookkeeping, accounting and recordkeeping system conforming to the requirements and formats we prescribe from time to time, including by completing our standard Chart of Accounts in the manner we specify. We may require you to use a Computer System to maintain certain sales and expense date and other information, in such formats as we periodically prescribe, and to transmit that data and information to us on a schedule we periodically prescribe. You also must maintain the Computer System in order to allow us unlimited independent access to, and the ability to download, all information in your Computer System at any time.[30]

…

To determine whether you and your staff are complying with this Agreement and all System Standards, we and our designated agents and representatives may at all times and without prior notice to you:

---

[29] *Id.* at Sec. 8.J(15).
[30] *Id.* at Sec. 10.

8

- inspect your Location;[31]

- observe, photograph, and videotape your Business' operation (including so called "mystery shopping") for consecutive or intermittent periods we deem necessary;[32]

- interview your personnel and customers;[33] and

- inspect and copy any books, records and documents relating to your operation.[34]

…

In addition to and without limiting our other rights and remedies under this Agreement, any other agreement and applicable law, upon the occurrence of any of the events that give rise to our right to terminate this Agreement under Sections 14.A, 14.B., 14.C. and 14.D., we may, at our sole option and upon delivery of written notice to you, elect to take any or all of the following actions without terminating this Agreement:

- Enter the Location's premises and assume management of the Location ourselves or appoint a third party (which may be our affiliate or a Regional Developer) to manage the Facility. If we or our assignee does so, the manager will not exercise direct or indirect control over the working conditions of the Massage Envy Locations except to the extent such indirect control is related to our legitimate interest in protecting the quality of products, services, or the Massage Envy brand. All funds from the operation of the Location while we or our appointee assumes its management will be kept in a separate account, and all of the expenses of the location will be charged to that account. We or our appointee may charge you (in addition to the amounts due under this Agreement) a reasonable management fee we specify, up to eight percent (8%) of the Location's Gross Sales, but not less than $5,000.00 per month, plus our (or our appointee's)

---

[31] *Id.* at Sec. 11.A(1).
[32] *Id.* at Sec. 11.A(2).
[33] *Id.* at Sec. 11.A(4).
[34] *Id.* at Sec. 11.A(5).

direct out-of-pocket costs and expenses.[35]

…

You and we understand and agree that this Agreement does not create a fiduciary relationship between you and us. You have no authority, express or implied, to act as an agent of us or any of our affiliates for any purpose. You are, and shall remain, an independent business owner responsible for all obligations and liabilities of your Business and for all claims or demands based on injury, illness or death of any person or persons, directly or indirectly, resulting from the operation of your Business. Further, we and you are not, and do not intend to be, partners, associates, or joint employers in any way, and we shall not be construed to be jointly liable for any of your acts or omissions under any circumstances. We have no relationship with your employees and you have no relationship with our employees. You agree to identify yourself conspicuously in all dealing with customers, suppliers, public officials, your personnel and others as the operator of a Massage Envy Location under a franchise we have granted and to place notices of independent ownership on the forms, business cards, stationary, advertising and other materials we require from time to time.[36]

…

We and you agree not to make any express or implied agreements, warranties, guarantees or representations, or incur any debt, in the name or on behalf of the other or represent that our respective relationship is other than franchisor and franchisee. We will not be obligated for any damage to any person or property directly or indirectly arising out of the operation of the Business or your other activities conducted under this Agreement.[37]

…

To the fullest extent permitted by law, you will defend, indemnify and hold harmless us, and our affiliates, and subsidiary companies, and their permitted successors and assigns, and each of their respective direct and indirect owners, directors, officers, managers, employees, agents, attorneys, and representatives and, if applicable, your Regional Developer and its members, owners, officers, directors and employees (collectively, the "Indemnified Parties") from and against all [Losses], which any of the Indemnified Parties may suffer, sustain or incur as a

---

[35] *Id.* at Sec. 14.E(7).
[36] *Id.* at Sec. 16.A.
[37] *Id.* at Sec. 16.B.

result of a claim asserted or inquiry made formally or informally, or a legal action, investigation, or other proceeding brought, by a third party and directly or indirectly arising out of the Business, your Franchise, the business you conduct under this Agreement, your breach of this Agreement and any noncompliance or alleged noncompliance with any law, ordinance, rule or regulation concerning the construction, design or operation of your Business including, without limitation, the Americans with Disabilities Act, any allegation that we or another Indemnified Party is a joint employer or otherwise responsible for the acts or omissions relating to your employees, and other laws regarding public accommodations for persons with disabilities.[38]

…

This Agreement is binding upon us and you and our and your respective executors, administrators, heirs, beneficiaries, permitted assigns and successors in interest. Subject to our rights to unilaterally modify the Operations Manual under Sections 4.D, the Systems Standards under Section 8.J and the Systems Standards and restrictive covenants under Section 17.B, this Agreement may not be modified except by a written agreement signed by both you and us.[39]

## C. The Wellness Agreement

Allegedly, Doe signed a contract ("Wellness Agreement") with MERB before any massage services were provided.[40] The Wellness Agreement functions as a club membership contract and defines the parties to the contract, explains the benefits, describes payment terms, establishes cancellation and use terms, and also includes a waiver of rights and liability clause.[41]

The Wellness Agreement states that the use of the words "you" and "your"

---

[38] *Id.* at Sec. 16.D.
[39] *Id.* at Sec. 17.K.
[40] Am. Compl. ¶ 38. An exact copy of Doe's Wellness Agreement was not included with the Complaint.
[41] *Id.* at Ex. C. (herein after "Wellness Agreement).

11

refer to the client of the Massage Envy franchise.[42] The agreement also defines the use of the words "we, our, and us" to refer to the individual franchisee.[43] The agreement refers to the Massage Envy franchise (i.e. MERB) as an independently owned and operated entity and expressly renounces MEF as an entity to the agreement between the client and the service provider.[44] Furthermore, the agreement states "[the client] understand[s] and agree[s] that neither MEF nor any of its affiliates are responsible for any acts or omissions related in any way to this [a]greement or the services provided to [the client] under this [a]greement."[45]

A majority of the remaining terms describe the benefits of the agreement, payment, cancellation, and use.[46] Of note is the binding national reciprocity clause that the client-members have with other independently owned and operated Massage

---

[42] *Id.*

[43] *Id.*

[44] *Id.*:

> This contract is between you and us. Neither Massage Envy Franchising, LLC the entity who granted us contractual authority to independently own and operate our franchised location, nor any of its past, present, or future affiliates or subsidiaries and their respective officers, directors, incorporators, members, partners, owners, agents, management, controlling parties, entities under common control, vendors, service providers, attorneys, employees, or representatives (all of the foregoing hereafter collectively referred to as 'MEF') is a party to your Wellness Agreement or the Wellness Program.

[45] *Id.*

[46] *Id.* Within the benefits terms there is a "National Reciprocity" clause:
> National Reciprocity
> While you are an active member, you may use your Wellness Benefits at any nationwide Massage Envy independently owned and operated location; however, prices and services may vary and may require additional payments. You are an active member if you have timely made all monthly Wellness Agreement payments, we have not terminated or suspended this Agreement, and you have not cancelled or frozen this Agreement.

Envy locations.[47] This clause allows for club members to redeem services at Massage Envy locations with which they have no express agreement and requires the independently owned locations to provide those services.[48]

## D.    The In-Store Intake Form

When clients check in to receive services at any Massage Envy location, they are asked to fill out an electronic intake form ("Intake Form").[49] The Intake Form first records basic demographic information.[50] It then prompts the client to customize the client's service by asking specific questions about any areas of stress or pain, areas of consent, daily activities, client lifestyle, and client health history.[51] Finally, the client gives consent through a general consent form as well as a clickwrap terms of use agreement.[52] The general consent contains an assumption of the risk, release, waiver of liability, and indemnification provisions.[53] The terms of use agreement is

---

[47] *Id.*
[48] *Id.*
[49] Def. Mot. to Dismiss, D.I. 103, Ex. 1A.
[50] *Id*.
[51] *Id.*
[52] *Id.*
[53] *Id.* The General Consent contains the following language:

Assumption of Risk, Release, Waiver of Liability, and Indemnification.

By signing below, you understand, acknowledge, agree and hereby voluntarily accept all risk and responsibility associated with the services provided and use of any of the facilities at any Massage Envy® location, any you acknowledge and agree that the information provided by you on this Wellness Chart may be shared with and utilized by any Massage Envy location for the purpose of providing you services at any Massage Envy location you choose. You hereby waive all claims, assume all liability, and release, hold harmless, indemnify, and agree to defend us (including our affiliates, agents, and employees), MEF, MEF's affiliates, and any other Massage

a separate clickwrap agreement between the client and the Massage Envy entities.[54]

At check-in on a prior visit to MERB October 16, 2017, Doe input her demographic information as requested and continued to the next section of the Intake Form.[55] Doe then marked her areas of stress or pain, depicted in a small illustration.[56] Next, Doe was prompted to provide her areas of consent.[57] Doe provided answers to a few questions, such as daily activities and medical history—not directly relevant to the issues in dispute—before continuing to the consent forms.[58]

The general consent form established an agreement between Doe and MERB.[59] The agreement effectively waives, in broad fashion, any claims from

---

Envy® location you may visit, from liability for any injury, claim, cause of action, suit, demand, and damages (including, without limitation, personal, bodily, or mental injury, property damage, economic loss, consequential damages, and punitive damages), arising from or related to (1) your failure to disclose any pre-existing conditions, limitations, or sensitivities; (2) your failure to inform your therapist or esthetician of discomfort or pain during or at the end of the service; (3) your presence on the premises of any Massage Envy® location; and/or (4) any negligence on our part (including our employees) or on the part of any other Massage Envy® franchise. You further expressly agree that this Assumption of Risk, Release, Waiver of Liability, and Indemnification is intended to be as broad and inclusive as permitted by law and that if any portion of it is held invalid, the balance shall be valid and continue in full legal force and effect. These provisions are binding on your estate, family, heirs, administrators, personal representatives, and assigns.

[54] The Terms of Use Agreement will be discussed with more specificity below.

[55] Def. Mot. to Dismiss, D.I. 103, Ex. 1A, at 3.

[56] Doe marked the following areas of stress: shoulders; arms and hands; legs; neck; back; gluteal region; and feet. Def. Mot. to Dismiss, D.I. 103 , Ex. 1A-1.

[57] Doe marked the following areas of consent: scalp; face; gluteal region; and feet. Doe did not consent to receiving therapeutic massage to her pectoral muscles or her abdomen area. *Id.*

[58] *Id.*

[59] "The words 'you' and 'your' mean the Member listed above (and the Buyer signing below with respect to payment). The words we, our, and us refer to RED Enterprises Incorporated d/b/a Massage Envy Rehoboth Beach, an independently owned and operated Massage Envy® franchise. The information provided to us by you in this application shall be collectively referred to as your 'Wellness Chart.'" *Id.*

liability associated with the services provided and use of any of the Massage Envy facilities.[60] By signing the form, Doe also acknowledged and agreed that all of the information provided in her Wellness Chart was correct and accurate, as it could "be shared with and utilized by any Massage Envy location for the purpose of providing [her] services at any Massage Envy location [of her choosing]."[61]

Moreover, the agreement provides that "[t]o the best of [MERB's] knowledge, only professional massage therapists and estheticians who comply with state, city, and/or local licensing or certification requirements are hired by [MERB]."[62] As it relates to the services themselves, the agreement states "[m]ale/female genitalia and women's breasts will not be exposed or massaged at any time" and that "[m]odest draping will be used" during the massage.[63] If there were any concerns or issues with the services provided, the agreement conditioned that they be brought to MERB's attention immediately following the massage.[64]

Finally, the last paragraph before Doe subscribed contained the following language:

- **YOU ACKNOWLEDGE AND AGREE THAT YOUR CONSENT TO THIS ASSUMPTION OF RISK, RELEASE, WAIVER OF LIABILITY AND INDEMNIFICATION IS GIVEN IN**

---

[60] Below the heading "General Consent" is the following language: "Please read and review in full to sign below." *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] The general consent states that "[i]nappropriate or illegal conduct will not be tolerated in any manner." *Id.*

15

**EXCHANGE FOR OUR RENDERING OF SERVICES, AND AGREE THAT THIS ASSUMPTION OF RISK, RELEASE, WAIVER OF LIABILITY AND INDEMNIFICATION SHALL APPLY AT EACH VISIT TO ANY MASSAGE ENVY® LOCATION. YOU ACKNOWLEDGE AND AGREE THAT EACH MASSAGE ENVY® LOCATION IS INDEPENDENTLY OWNED AND OPERATED AND YOUR SERVICES WILL BE RENDED US [sic] AND NOT BY MEF OR ANY OF ITS AFFILIATES. YOU UNDERSTAND AND AGREE THAT OUR THERAPISTS AND ESTHETICIANS ARE OUR EMPLOYEES AND ARE NOT EMPLOYED BY AND ARE NOT EMPLOYEES OF MEF OR ANY OF ITS AFFILIATES. YOU ACKNOWLEDGE AND AGREE THAT AT NO TIME SHALL YOU HAVE A RIGHT TO, NOR SHALL YOU, ASSERT OR BRING ANY CLAIM, DEMAND, OR LEGAL ACTION AGAINST MEF OR ANY OF ITS AFFILIATES RELATING TO THIS AGREEMENT OR THE SERVICES PROVIDED BY US. YOU FURTHER ACKNOWLEDGE AND AGREE THAT NEITHER MEF NOR ANY OF ITS AFFILIATES SHALL HAVE ANY LIABILITY FOR (i) ANY OBLIGATIONS OR LIABILITIES RELATING TO OR ARISING FROM OUR RENDERING OF SERVICES TO YOU; (ii) ANY CLAIM BASED ON, IN RESPECT OF, OR BY REASON OF THE RELATIONSHIP BETWEEN YOU AND US; OR (iii) ANY CLAIM BASED UPON ANY ALLEGED UNLAWFUL ACT OR OMISSION BY US OR ANY OTHER MASSAGE ENVY® LOCATION.**[65]

Doe entered into the agreement by clicking a small checkbox that was marked "I agree and assent to the <u>Terms of Use Agreement</u>,"[66] and subscribing the form with her initials.[67] Doe submitted the form by clicking the button marked "Continue" and

---

[65] *Id.* (all-capitals and bold in original).
[66] The Terms of Use Agreement will be analyzed with more specificity *infra*. *Id.* (underline included).
[67] *Id.*

was advised on the next electronic screen that her therapist would be with her shortly.[68]

**E.     The Terms of Use Agreement**

The Intake Form discussed above has a small checkbox that is marked "I agree and assent to the <u>Terms of Use Agreement</u>."[69] The clickwrap link directs the user to a new page which is titled "Terms and Conditions."[70]

The Terms and Conditions agreement consists of fifteen sections.[71] The agreement defines the standards of use for the Massage Envy website, mobile application, in-store application, and all aspects of service.[72] It also defines the term "service," lists the warranty disclaimers,[73] provides a limitation of liability,[74] establishes an indemnification clause,[75] implements a binding individual arbitration,[76] contains a choice of law and jurisdiction clause, contains multiple use

---

[68] *Id.*

[69] Def. Mot. to Dismiss, D.I. 103 Ex. 1A-1 (underline included).

[70] *Id*. Ex. 2A-2.

[71] *Id.*

[72] *Id.*

[73] The disclaimer of warranties contains standard, boiler-plate language for the waiver of express warranties, implied warranties, warranties of merchantability, and warranties of fitness for a particular purpose. *Id.*

[74] The limitation of liability contains standard, boiler-plate language for the limitation of damages for claims arising under the Terms of Use Agreement. *Id.*

[75] The indemnification clause contains standard, boiler-plate language establishing indemnification from any claims, demands, liabilities, damages, losses, and expenses governed by the Terms of Use Agreement. *Id.*

[76] The binding individual arbitration clause of the Terms of Use Agreement is complex and contains multiple parts. First, it defines the term "disputes" as it relates to what claims the arbitration clause will be enforced. Then, it explains what is excluded from arbitration, how a client can opt out of the binding arbitration, and what notice is required to bring a dispute forward to Massage Envy. *Id.*

17

of services provisions, and concludes with a merger clause.[77]

The scope of what the Terms and Conditions agreement governs is found on the first page of the agreement as follows:

THIS AGREEMENT SETS FORTH LEGALLY BINDING TERMS AND GOVERNS YOUR ACCESS TO AND ALL USE OF THE WEBSITE AND/OR THE APPLICATIONS(S) AND THE INFORMATION OR CONTENT CONTAINED ON ANY ONE OR ALL OF THEM, AND ANY OF THE SERVICES (DEFINED BELOW). BY ACCESSING OR USING THE WEBSITE, THE APPLICATIONS(S) AND/OR THE INFORMATION OR CONTENT CONTAINED ON ANY ONE OF THEM, AND/OR ANY SERVICE (DEFINED BELOW), YOU ARE ACCEPTING THIS AGREEMENT AND YOU REPRESENT AND WARRANT THAT (1) YOU HAVE READ, UNDERSTAND, AND AGREE TO BE BOUND BY THIS AGREEMENT, (2) YOU ARE AT LEAST 18 YEARS OLD, AND (3) YOU HAVE THE RIGHT AND AUTHORITY TO ENTER INTO THIS AFREEMENT. YOU MAY NOT ACCESS OR USE THE WEBSITE, EITHER OF THE APPLICATIONS AND/OR THE INFORMATION OR CONTENT CONTAINED ON ANY ONE OF THEM, AND/OR ANY SERVICE (DEFINED BELOW) IF YOU ARE NOT AT LEAST 18 YEARS OLD. IF YOU DO NOT AGREE TO BE BOUND BY THIS AGREEMENT, YOU MAY NOT ACCESS OR USE THE WEBSITE, EITHER OF THE APPLICATIONS AND/OR THE INFORMATION OR CONTENT CONTAINED ON ANY ONE OF THEM, and/OR [sic] ANY SERVICE (DEFINED BELOW).[78]

The term "Service" is defined as:

Through the Website and/or the Application(s), MEF, LLC is providing you with information about products and services offered at independently owned and operated Massage Envy® franchised locations, including massage and facial sessions, along with (a) the ability to schedule, modify and/or cancel appointments with any

---

[77] *Id.*

[78] *Id.* (all capitals in original).

Massage Envy® franchised location; (b) provide information to and complete forms with your independently owned and operated Massage Envy® franchised location regarding massage and facial sessions; (c) enter into and use benefits under any Wellness Agreement entered with your independently owned and operated Massage Envy® franchised location; (d) purchase and/or redeem gift cards; (e) purchase of massage and facial sessions and product at any independently owned and operated Massage Envy® franchised location as a guest; (f) view information about and find the independently owned and operated Massage Envy® franchised location nearest you; (g) request franchise information; (h) complete customer satisfaction surveys; (i) view opportunities to apply for employment with Massage Envy® independently owned and operated franchised locations; and/or (j) apply for job openings at MEF, LLC corporate (collectively the "Service").[79]

The next clause of particular importance is the binding individual arbitration clause (the "Arbitration Clause").[80] Relevant to the instant case is the definition of "Dispute:"[81]

> . . . any dispute, claim or controversy of any kind between you and any of the ME Entities that arise out of or in any way relate to (1) your access to the Website and/or the Application(s); (2) your use of the Website and/or the Applications(s); (3) the provision of content, services, and/or products on or through the Website, the Application(s) and/or the Service; (4) any product or service provided by or purchased from an independently owned and operated Massage Envy® franchised location; and/or (5) this Agreement, including the validity, enforceability or scope of this Binding Individual Arbitration Section (with the exception of the Class Action Waiver clause below), whether based in contract, statute, regulation, ordinance, tort (including, but not

---

[79] *Id.* ¶ 1.
[80] *Id.* ¶ 5.
[81] *Id.*

limited to, fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory.[82]

Clients have a right to opt-out of the binding arbitration clause under the agreement.[83] In addition to the opt-out, there is a notice requirement relating to any disputes with MEF.[84] Finally, the Arbitration Clause sets forth the parameters for the arbitration and how the process should proceed if applicable.[85]

Another section of importance is the choice of law and jurisdiction provision, which states the following:

- **THE PARTIES AGREE THAT THE LAWS OF THE STATE OF ARIZONA, WITHOUT REGARD TO ITS CONFLICT OF LAW RULES, GOVERN THIS AGREEMENT AND ANY DISPUTES BETWEEN YOU AND** any **ME ENTITIES. ANY DISPUTE NOT SUBJECT TO ARBITRATION WILL BE LITIGATED** exclusively **BY EITHER PARTY IN A COURT OF COMPETENT JURISDICTION IN EITHER THE SUPERIOR COURT OF THE STATE OF ARIZONA IN AND FOR THE COUNTY OF MARICOPA OR IN** the **UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA.**[86]

Finally, the Terms of Use Agreement concludes with an "Other Terms" clause.[87] It reads as follows:

- Except as otherwise stated herein, this Agreement constitutes the entire

---

[82] *Id.* Excluded from arbitration are: i) claims regarding the infringement, protection, and/or MEF, LLC's trade secrets, copyrights, trademarks, or patent rights and ii) small claims court disputes.

[83] *Id.* Written notice must be sent within thirty days of acceptance and guidelines of the notice are set forth in the provision.

[84] *Id.* Written notice must be sent to info@massageenvy.com to give the MEF an opportunity to resolve through negotiations.

[85] *Id.*

[86] *Id.* (all capitals and bold in original).

[87] *Id.* ¶ 15.

and exclusive understanding and agreement between you and MEF, LLC regarding the Website, the Applications and any Service and supersedes and replaces any and all prior oral and written understandings or agreements between you and MEF, LLC regarding the Website, the Applications, and/or any Service. If any provision of this Agreement shall be unlawful, void or unenforceable for any reason, the other provisions (and any partially-enforceable provision) shall not be affected thereby and shall remain valid and enforceable to the maximum possible extent. You agree that this Agreement and any other agreements referenced herein may be assigned by MEF, LLC, in its sole discretion, to a third party in the event of a merger or acquisition. This Agreement shall apply in addition to, and shall not be superseded by, any other written. Agreement between MEF, LLC and you in relation to your participation as a user of the Website, the Application(s) and/or any Service without accepting this Agreement and that by accepting this Agreement, you are consenting to the use and disclosure of your personally identifiable information and other practices described in our Privacy Policy (also available at https://www.massageenvy.com/privacy). Your use of the Website, the Application(s) and/or any Service also is an acknowledgement that no ME Entity is a party to any Wellness Agreement you may have entered at your independently owned and operated Massage Envy® franchised location.[88]

## F.     The Sexual Assault Incident

Doe was scheduled to receive a massage on November 7, 2018.[89] Doe was familiar with MERB as she had received massages at this location two times prior to the November 7, 2018 incident.[90] Doe consented to the massage when she

---

[88] *Id.*
[89] Am. Compl. ¶ 65.
[90] *Id.* ¶ 66.

completed the In-Store Intake Form.[91] Upon completion of her check-in, she was assigned a massage therapist she knew as "Evan."[92]

The alleged sexual assault occurred on the massage table of MERB.[93] Around 5:30 pm, Doe was expecting to receive a massage with aromatherapy.[94] Evan greeted Doe in the hallway and he made a comment about the blouse she was wearing, before guiding her to a room.[95] He told her to get undressed and lie face up for the start of the massage, and she complied.[96]

The massage began by Evan focusing on Doe's scalp as she requested.[97] When Evan transitioned to working on Doe's legs, he lifted the sheet and asked her to turn over onto her stomach.[98] Evan looked at Doe's nude body.[99] He began massaging her right leg, moving up her thigh.[100] Doe could feel Evan rubbing the inside of her leg, close to her vagina and felt his finger make direct skin to skin contact with her genitals.[101] Evan apologized.[102]

---

[91] *See* Def. Mot. to Dismiss, D.I. 103, Ex. 1A-1.
[92] She had never received a massage from Evan prior to this date. Am. Compl. ¶ 67-69.
[93] *Id.* ¶ 71.
[94] *Id.* ¶ 75.
[95] *Id.* ¶ 76.
[96] *Id.*
[97] *Id.* ¶ 77.
[98] *Id.* ¶ 78.
[99] *Id.*
[100] *Id.* ¶ 79.
[101] *Id.*
[102] *Id.*

The massage continued by Evan transitioning to Doe's left side.[103] Evan was consistently rubbing the area of Doe's body where her inner thigh meets her groin.[104] She attempted to squirm on the table to get him away from her vagina.[105] He then moved back to her right side and stayed there.[106] At this point, Doe "felt frozen" by what was happening.[107]

Doe asked Evan to move on to her upper back.[108] He obliged, but he kept one hand in the crease between her leg and vagina continued to make skin-to-skin contact with her genitals.[109] The massage ended after Doe declined to allow Evan to continue.[110]

Doe reported Evan to the police and to MERB.[111] Doe was never contacted by MERB, and Doe alleges that MERB never reported Evan to the Board of Massage and Bodywork.[112]

## STANDARD OF REVIEW

The standard of review on a motion to dismiss is well-settled. The court must determine whether there are any facts that could be proven to support the claims

---

[103] *Id.* ¶ 80.
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.*
[108] *Id.* ¶ 81.
[109] *Id.*
[110] *Id.*
[111] *Id.* ¶ 82.
[112] *Id.*

made in the complaint such that the plaintiff would be entitled to relief.[113] The

burden rests with the moving party.[114] This court will take all well-pleaded factual

allegations as true and draw all reasonable inferences in favor of the non-moving

party.[115] The court will accept vague allegations as well-pleaded if they give notice

to the opposing party as to the claim; however, the court must ignore conclusory

allegations that lack specific supporting factual allegations.[116] Dismissal is

inappropriate unless this court determines there are no set of conceivable well-

pleaded facts that would allow the plaintiff to recover.[117] The bar to survive a motion

to dismiss is minimal given that it may later be found impossible for a plaintiff to

prove her claims at a later stage of a proceeding.[118]

Furthermore, assertions of fraud, negligence, or mistake "shall be stated with

particularity" in the complaint.[119] "Malice, intent, knowledge, and other condition of

mind of a person may be averred generally."[120] Thus, particularity in pleading a

negligence claim can be satisfied by "specifying a duty, a breach of duty, who

breached the duty, what act or failure to act caused the breach, and the party who

---

[113] *See* Super. Ct. R. 12(b)(6).
[114] *Id. See also, Jeanbaptiste v. Clarios, LLC*, 2020 WL 2375047, *1 (Del. Super. Ct. May. 11, 2020) (citations omitted).
[115] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 536-37 (Del. 2011).
[116] *Id.*
[117] *Id.*
[118] *Id.*
[119] Super. Ct. R. 9(b).
[120] *Id.*

acted."[121] Particularity in pleading a fraud claim requires that the complaint set forth the "time, place, and contents of the alleged fraud, as well as the individuals accused of committing the fraud."[122]

## CHOICE OF LAW

The parties dispute whether Arizona or Delaware law should apply. To address this question, it is first necessary to review aspects of the procedural history of this case. MEF filed a previous motion to dismiss, arguing that the Terms of Use Agreement required any disputes to be arbitrated. The argument turned on whether Doe signed an enforceable clickwrap agreement or an unenforceable browsewrap agreement.[123] This court found that the agreement was a clickwrap agreement, and by Order dated December 21, 2020, dismissed the Complaint against MEF. This court left the question of unconscionability—which was one of the arguments raised by Doe in opposition to the motion to dismiss—to the arbitrator, and the case proceeded to arbitration. Doe argued to the arbitrator that the Terms of Use

---

[121] *See Wood v. Rodeway Inn*, 2015 WL 994855, *2 (Del. Super. Ct. Mar. 4, 2015); *see also Rinaldi v. Iomega Corp.*, 1999 WL 1442014, at *7 (Del. Super. Ct. Sept. 3, 1999).

[122] *See TrueBlue, Inc. v. Leeds Equity Partners IV, LPI*, 2015 WL 5968726, at *6 (Del. Super. Ct. Sept. 25, 2015) (citations omitted); *see also Mooney v. Pioneer Natural Resources Co.*, 2017 WL 4857133, at *4 (Del. Super. Ct. Oct. 24, 2017) (citations omitted).

[123] Similar cases to this one—also involving allegations of sexual assault and with essentially the same language as in the Terms of Use Agreement in this case—are pending in various jurisdictions around the country. Courts considering the language of the arbitration requirement have reached different conclusions despite the identical language. For example, in *Massage Envy Franchising, LLC v. Doe*, 339 So.3d 481 (Fla. Dist. Ct. App. 2022), the court found the agreement constituted a valid clickwrap agreement and remanded the case to the trial court to be sent to arbitration. In contrast, in *Doe v. Massage Envy Franchising, LLC*, 87 Cal. App.5th 23 (2022), the court upheld the trial court's finding that there was no enforceable arbitration clause.

25

Agreement was both procedurally and substantively unconscionable and that sexual assault was beyond the scope of the agreement. The arbitrator agreed with Doe, and the case returned to this court.

In their briefs on the current motion to dismiss, the parties do not squarely address the issue of choice of law. In a footnote in MEF's brief, it simply points out that the Terms of Use Agreement contains an Arizona choice of law provision, and then it proceeds to cite mostly Arizona cases.[124] In response, Doe asserts Delaware law should be applied because the arbitrator found the Terms of Use Agreement to be unconscionable and therefore invalid, and then proceeds to cite Delaware law throughout its brief.[125] The court addressed this difference in positions with the parties and offered them an opportunity to develop their arguments, but they declined.[126]

While I disagree with Doe's claim that I am bound by the arbitrator's determination that the Terms of Use Agreement was unconscionable, I agree with the arbitrator's reasoning when he found that the alleged sexual assault is outside Terms of Use Agreement. The scope of the Terms of Use Agreement is set forth in the second full paragraph on its first page.[127] It states:

---

[124] Def. Mot. to Dismiss, D.I. 103, at 9, n.2
[125] Pl. Opp'n Resp., D.I. 109, at 1.
[126] Judicial Action Form, D.I. 134; Mar. 6, 2024 letter to the court from Philip Edwards, Esq., D.I. 136.
[127] *See* Def. Mot. to Dismiss, D.I. 103, Ex. 2A-2.

This Agreement sets for the standards of use for the www.massageenvy.com website (the "Website"), the Massage Envy® Mobile Application (the "Mobile Application") and the Massage Envy® In-Store Forms Application (the "In-Store Application") (the Mobile Application and In-Store Application are collectively the "Applications"). This Agreement is intended to apply broadly and it governs any and all access and use of the Website and/or the Applications, the information or content contained on the Website and/or the Applications, and all aspects of the Service (defined below).[128]

"Services" is then defined in section one of the Terms of Use Agreement,

under "Description of Service" as:

Through the Website and/or the Application(s), MEF, LLC is providing you with information about products and services offered at independently owned and operated Massage Envy® franchised locations, including massage and facial sessions, along with (a) the ability to schedule, modify and/or cancel appointments with any Massage Envy® franchised location; (b) provide information to and complete forms with your independently owned and operated Massage Envy® franchised location regarding massage and facial sessions; (c) enter into and use benefits under any Wellness Agreement entered with your independently owned and operated Massage Envy® franchised location; (d) purchase and/or redeem gift cards; (e) purchase of massage and facial sessions and product at any independently owned and operated Massage Envy® franchised location as a guest; (f) view information about and find the independently owned and operated Massage Envy® franchised location nearest you; (g) request franchise information; (h) complete customer satisfaction surveys; (i) view opportunities to apply for employment with Massage Envy® independently owned and operated franchised locations; and/or (j) apply for job openings at MEF, LLC corporate (collectively the "Service").

---

[128] *Id.*

As the arbitrator noted, this "lawsuit for sexual assault is not about, nor does it arise from the utilization of MEF's website or 'applications,' or any of the so-called 'Services.' It is not about MEF's providing misinformation about a franchisee's products or services, or misinformation on how to become a franchisee or how to apply for a job."[129] None of Doe's claims in her Complaint relate to her use of MEF's Website or Applications.

For these reasons, the choice of law provision in the Terms of Use Agreement is inapplicable to Doe's suit, and this court will apply Delaware law in considering MEF's motion to dismiss.

## ANALYSIS

Count 1: Vicarious Liability

MEF argues Doe has not pleaded any facts indicating that an agency or employment relationship existed between MEF and MERB, or any of MERB's employees.[130] Further, MEF suggests Doe would need to show specific facts that Evan was hired by or otherwise employed by MEF *and* was acting within the scope his employment, for this claim to survive.[131] MEF also argues that it did not own or

---

[129] Pl. Opp'n Resp., D.I. 109, Ex. E (filed under seal).
[130] Def. Mot. to Dismiss, D.I. 103, at 2.
[131] *Id.* (emphasis added).

operate the spa at which Doe was allegedly assaulted.[132]

A. <u>Was there an agency relationship between MEF and Evan?</u>

Delaware law relies on the Restatement (Second) of Agency § 1 to determine vicarious liability.[133] Under Delaware law, "a franchisor may be held to have an actual agency relationship with its franchisee when the former controls, or has the right to control, the latter's business."[134] If a franchise agreement exists between the parties and the agreement goes "beyond the stage of setting standards, and allocates to the franchisor the right to exercise control over the daily operations of the franchise, an agency relationship exists."[135] For example, where franchisors micro-manage the operations of franchisees by requiring them to adhere to strict operating agreements and non-compliance could result in forfeiture of the business, Delaware courts have routinely denied summary judgment motions so the parties can further develop the record for the triers of fact to make the determination as to whether the control exhibited amounted to a principal-agent relationship.[136]

---

[132] *Id.*

[133] *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57-58 (Del. 1997); *see also Lang v. Morant*, 867 A.2d 182, 186 nn.15-16 (Del. 2005).

[134] *Cumpston v. McShane*, 2009 WL 1566484, *3 (Del. Super. Ct. June 4, 2009) (citations omitted).

[135] *Id.* (citations omitted).

[136] *Id.*; *see Billops v. Magness Constr. Co.*, 391 A.2d 196, 197 (Del. 1978) (illustrating where a franchise agreements and manuals for operation amounted to more than mere setting of standards and the defendant's motion for summary judgment was denied); *See also*, *Int'l Dairy Queen, Inc.*, 333 A.2d 160, 163 (Del. Super. Ct. 1975).

The Delaware Supreme Court in *Billops v. Magness Construction Company* applied this rationale in reversing the Superior Court's decision to grant the corporate franchisor's motion for summary judgment.[137] Plaintiff filed multiple claims against defendants Magness Construction Co., t/a Brandywine Hilton Inn, Inc., (the franchisee), Hilton Inns, Inc., Hilton Hotels Corporation, Hilton International Co., (collectively the franchisors), and Gray Magness.[138] The lower court granted the franchisors' motion for summary judgment, determining that no actual or apparent agency relationship existed between the franchisors and the franchisees, and thus, no legal basis existed for holding the franchisors vicariously liable for the torts of the franchisee or its employees.[139] The Supreme Court reversed.[140] When viewing the facts in the light most favorable to the non-moving party, the Court held that there were sufficient facts on the record, as well as the inferences that could be drawn, that the franchisor had extensive control over the franchisee's daily activities and the reversal was necessary for the issue of agency to be resolved at trial.[141] In reaching this conclusion, the Court relied on the detailed operating manual and its incorporation into the parties' franchise agreement.[142] The Court noted the extensive control the franchisor retained over the franchisee's day-

---

[137] 391 A.2d 196 (Del. 1978).
[138] *Id.* at 197.
[139] *Id.*
[140] *Id.*
[141] *Id.*
[142] *Id.* at 198.

to-day operations through the manual's regulation on matters such as branding, advertising, office procedures, custodial procedures and policies, food and beverage sales and preparation procedures, staff policy and procedures around scheduling and soliciting group events, functions surrounding room reservation, accounting, insurance, engineering and maintenance, and a number of other details of operation.[143] Further, the franchisor retained the express right to enter the premises to inspect and ensure compliance with the provisions of the operating manual through the franchise agreement.[144] If the franchisor found the franchisee failed to comply with the franchise agreement, it retained the right to unilaterally terminate the agreement.[145] The Court concluded that "[w]hile we make no judgment as to whether, in this case, an actual agency relationship exists, we cannot say it does not. The facts of record reveal a triable issue on the question of actual agency, and defendants were not entitled to summary judgment."[146]

As in *Billops*, the Franchise Agreement (and presumably the Operating Manual that is not part of the record but is referenced in the Franchise Agreement) between MEF and MERB controls much of MERB's day-to-day operations in detail,

---

[143] For an extensive list, *see id.*
[144] *Id.*
[145] "If Licensee violates any provision of this Agreement or of the Operating Manual and such violation continues for a period of twenty (20) days after written notice from Licensor,…, then the Licensor without further demand or notice, may declare this License Agreement and all of Licensee's rights hereunder terminated,…" *Id.*
[146] *Id.* (*citing Cross v. Hair*, 258 A.2d 277 (Del. 1969)).

as shown in the excerpts included above in this opinion. If there were problems at MERB, MEF had the ability to take over certain operations of MERB and to terminate the Franchise Agreement. Simply because the Franchise Agreement states MEF does not have day-to-day control—as argued by MEF—does not make it so. The mere recital of those words, however, cannot overcome the remainder of the language in the Franchise Agreement that *does* give great control over the operations of MERB.

In her Complaint, Doe has pleaded sufficient facts to show the sexual assault alleged in the Complaint was a possible risk of which MEF should have been aware. Doe alleges MEF maintains a list of all sexual assault complaints occurring within its franchise locations.[147] Doe also alleges that MEF protocols, polices, and trainings direct all owners, managers, and employees to handle all sexual assault allegations in-house.[148] As alleged, the same policy does not require reporting sexual assaults of customers by its massage therapists to law enforcement and regulatory bodies such as, in this case, the Delaware Board of Massage and Bodywork.[149] Moreover, Doe alleges there had been efforts among MEF and its franchisees to conceal the danger

---

[147] Am. Compl. ¶ 31.
[148] *Id.* ¶ 29.
[149] *Id.* ¶ 32.

of sexual assault in their services such that it led MEF to be the subject of extensive controversy.[150]

B. Was Evan acting outside the scope of his employment?

MEF argues that because Evan was acting outside the scope of his employment, MEF cannot be held liable for his tortious conduct.[151] The Restatement (Second) of Agency § 228 creates four factors to consider when determining the scope of employment: "(1) it is of the kind he is employed to perform; (2) it occurs within the authorized time and space limits; (3) it is activated, in part at least, by a purpose to serve the master; and (4) if force is used, the use of force is not unexpectable by the master."[152] These questions are typically for the jury, although the court should decide them as a matter of law when the answers are "so clearly indicated by the facts."[153] Where a reasonable person could differ as to the examination of the facts, the question should be submitted to a jury for decision.[154]

In the present case, it is clear that: (1) Evan was providing a massage to Doe when the alleged sexual assault occurred, which is the type of work he was employed to do; (2) the incident occurred during normal operating hours, during a regularly scheduled massage, at a Massage Envy location; and (3) the massage Evan was

---

[150] *Id.* ¶ 33.
[151] Def. Mot. to Dismiss, D.I. 103, at 11-14.
[152] *Draper v. Olivere Paving & Construction Co.*, 181 A.2d 565, 570 (Del. 1962); *see also* Restatement (Second) of Agency § 228 (1958).
[153] *Draper*, 181 A.2d at 569-570.
[154] *Id.*

providing was part of MEF and MERB's business. As the Delaware Supreme Court found in *Draper*, the question of whether Evan was acting within the scope of his employment is a question best left to the jury. Therefore, MEF's motion to dismiss Count 1 is denied.

Count 2: Negligence

To bring a successful negligence claim, a plaintiff must prove that: (1) the defendant owed a duty of care, (2) the actor breached that duty, and (3) the breach proximately caused the injury to the plaintiff.[155] Whether a duty exists is a question of law for the court to decide.[156] "Absent such duty, a defendant cannot be held liable for negligence, no matter how harmful or reprehensible his conduct may be."[157] Delaware courts rely upon the Restatement (Second) of Torts to determine whether one party owes another a duty of care.[158] Where the negligent conduct is alleged to be an affirmative act, the duty owed is one which a reasonable person would expect under the same or similar circumstances to protect him from the harm arising out of the act.[159] Alternatively, where the negligent conduct is an alleged failure to act, unless a special relationship between the actor and the plaintiff exists as defined by

---

[155] *Murray v. Mason*, 244 A.3d 187, 194 (Del. Super. Ct. 2020).
[156] *Id.*
[157] *Id.*
[158] *Id.* at 194. *See* Restatement (Second) of Torts §§ 284, 314–324A (1965).
[159] Restatement (Second) of Torts § 284 (1965); *see also Murray*, 244 A.3d at 194-195.

the Restatement (Second) of Torts § 315, there will be no liability for declining to act.[160]

MEF argues Doe's negligence claim must fail because she has not adequately pleaded that MEF owed a duty to protect her from conduct of a third party and that no special relationship existed.[161] MEF states it is a franchisor that is independent of its franchisee, MERB, and Doe cannot establish there is a special relationship to subject MEF to liability for the actions of MERB or its employees.[162] To support this argument, MEF relies on cases whose common theme is the amount of legal control the defendant assumed over the third party.[163] For example, in *Murray v. Mason*, the Superior Court denied claims filed against Brandywine Valley SPCA ("BVSPCA") where the plaintiff could not establish that a special relationship existed between the dog owners at the time of the attack and the BVSPCA.[164] The court held that there is no duty to control the conduct of a third person as to prevent him from causing physical harm to another, unless a special relationship exists between the actor and the injured party which gives the injured party a right to protection.[165] Next, MEF cites to Arizona cases that stand for the proposition that there is no inherent duty for

---

[160] Restatement (Second) of Torts § 315(a), (b) (1965); *Murray*, 244 A.3d at 195.
[161] Def. Mot. to Dismiss, D.I. 103, at 2.
[162] *Id.* at 15.
[163] *Id.* at 16.
[164] *Murray*, 244 A.3d at 195-96.
[165] *Id.* at 196.

a franchisor to prevent criminal conduct or oversee the actions of its franchisees.[166] The Arizona court in *Colson v. Maghami*, decided at the motion for summary judgment stage, that there was an explicit difference between the employer-employee relationship and a franchisor-franchisee relationship.[167]

Doe argues there are sufficient facts in the Complaint supporting her claim that MEF owed a duty to protect and warn her from harm sustained at MERB by Evan.[168] Doe claims that the amount of control MEF retains over the independently owned and operated Massage Envy franchisees means that they are not truly independent.[169] First, Massage Envy franchisees are only allowed to operate under the exclusive agreement with MEF, under the direction of MEF and its operations manual, and pursuant to all MEF guidelines, policies, and procedures.[170] Furthermore, it is alleged that MEF retains a centralized repository for the internal management and storage of any and all sexual assault reports that occur at the franchise level.[171] Doe contends that the totality of these circumstances demonstrate

---

[166] MEF also argues that *Cullen v. BMW of N. Am., Inc.*, 691 F.2d 1097, 1100-01 (2d. Cir. 1982) stands for the proposition that "a franchisor did not have a duty to prevent criminal conduct of its franchisees." That was not the court's holding; rather, the issue decided was that the plaintiff's injury was not reasonably foreseeable to the franchisor. *See Colson v. Maghami*, 2010 WL 2744682, at *10 (D. Ariz. July 9, 2010) (citations omitted).

[167] *Id.* at 10-13.

[168] Pl. Opp'n Resp., D.I. 109 at 19.

[169] *Id.*

[170] *Id.*

[171] *Id.*

how MEF controls the day-to-day operations of its franchisees, ultimately establishing a duty to its clients to protect and warn them from harm.[172]

I find there are sufficient facts pleaded in the Complaint from which I can draw a reasonable inference that MEF owed a duty to Doe. Notably, many of the cases cited by MEF—despite being Arizona law—were disposed of at the summary judgement stage in the proceeding. At this stage in the proceedings, there are many questions of fact in dispute, and therefore this decision cannot be made as a matter of law. The Complaint alleges MEF knew of sexual allegations through a centralized database and established the policies and procedures for the franchisees to follow when complaints arise. Doe also asserts the alleged sexual assault took place at a Massage Envy location, during normal operating hours, at a regularly scheduled massage. All these aspects of the business are alleged to be under control of MEF, either directly or indirectly, through the extensive policies, procedures, and guidance MEF requires of its franchisees. Although there are express provisions in the Franchise Agreement and Wellness Agreement that attempt to distance MEF from its independently owned and operated Massage Envy locations, Delaware law supports alternative theories of agency and vicarious liability that would establish a duty to clients. Doe has demonstrated facts for which I could reasonably conclude a duty did exist.

---

[172] *Id.* at 19-20.

A finding of negligence alone will not sustain an action for damages.[173] Rather, the plaintiff must prove the defendant's negligence was the proximate cause of the plaintiff's injuries.[174] Delaware law recognizes the traditional "but-for" notion of causation.[175] The proximate cause is one "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces an injury and without which the result would not have occurred."[176] Notwithstanding, the original tortfeasor will not be relieved of liability for an intervening act causing injury if the act should have been foreseen or, if to a reasonable person, the result should have been anticipated.[177] "If, however, the intervening negligence was not reasonably foreseeable, the intervening act supersedes and becomes the sole proximate cause of the plaintiff's injuries…."[178]

MEF submits that Doe fails to adequately allege that MEF breached any duty owed to her in a way that caused her injuries.[179] MEF argues that there are no allegations in her Complaint of a causal nexus between MEF's negligence and Doe's

---

[173] *Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 828 (Del. 1995) (overruled on other grounds); *Lagola v. Thomas*, 867 A.2d 891 (Del. 2005).
[174] *Id.*
[175] *Id.*
[176] *Id.* (*quoting Culver v. Bennett*, 588 A.2d 1094, 1097 (Del. 1991) (citation omitted)).
[177] *Id.* at 829 (*citing McKeon v. Goldstein,* 164 A.2d 260, 262 (Del. 1960) holding that the liability of the original tortfeasor will not be excused if it should have been reasonably foreseeable or anticipated).
[178] *Id.* (citation omitted).
[179] Def. Mot. to Dismiss, D.I. 103, at 2.

assault.[180] To support its argument, MEF claims Evan's criminal conduct was an intervening, superseding cause that precludes a finding of causation against MEF and that MEF's negligence was not the "but-for" cause of Doe's injuries.[181] MEF claims that Doe has not set forth facts to show how any of MEF's purported failures actually caused her injuries from the assault or how appropriate standards or warnings could have prevented the assault.[182]

Doe argues that Delaware law only requires her to plead facts showing that MEF's negligence was the proximate cause of damages in that it was foreseeable.[183] Doe contends that disputed issues of foreseeability and proximate cause involve factual determinations that must be submitted to a jury.[184] Doe states that a defendant will not be relieved of a third party's tortious acts if the intervening act was apprehensible and reasonably foreseeable.[185] To support her argument, Doe cites to a number of Delaware cases.[186]

This court's decision in *Rutledge v. Wood*[187] addresses the issue of proximate cause squarely:

> Generally, the issue of proximate causation is a question of fact, which must be determined by the trier of fact…. Indeed, the issue of proximate

---

[180] *Id.* at 18.
[181] *Id.* at 18-19.
[182] *Id.* at 19-20.
[183] Pl. Opp'n Resp., D.I. 109, at 22.
[184] *Id.*
[185] *Id.* at 23.
[186] *Id.* at 22-23.
[187] 2003 WL 139758 (Del. Super. Ct. Jan. 17, 2003).

cause "is to be determined, on the facts, upon mixed considerations of logic, common sense, justice, policy and precedent…." [Only] where there can be no reasonable difference of opinion as to the conclusion to be reached on the question of whether an intervening cause is abnormal, unforeseeable, or extraordinary negligent, should the question of proximate causation be determined by the court as a matter of law.[188]

Drawing all reasonable inferences in favor of Doe, I find she has adequately pleaded facts to support a claim of negligence as to the element of causation. Where reasonable minds could differ as to whether MEF's actions were negligent and whether those actions were the legal cause of the injuries sustained by Doe, the issue may not be determined as a matter of law. The issue of proximate cause is generally reserved for the trier of fact absent exceptional circumstances.

MEF also argues that Doe's Complaint fails to contain facts as to the foreseeability of Evan's criminal conduct and such conduct is a superseding cause of Doe's injuries. MEF notes there are no reports of prior complaints or misconduct from Evan alleged in the Complaint that would put MEF or MERB on notice of potential problems with Evan. Alternatively, Doe claims the sexual assault was foreseeable in ways that MEF chose to conceal and that MEF's failure to warn led to Doe's injuries. Doe's Complaint alleges MEF was fully aware of sexual assault allegations that were occurring at its Massage Envy locations nationwide. The Complaint also states MEF required the individual franchisees to operate in

---

[188] *Id.* at *3 (*citing Duphily*, 662 A.2d at 828-29, 31; *Chudnofsky v. Edwards*, 208 A.2d 516, 518).

accordance with MEF-implemented policies and procedures for handling sexual assault and misconduct violations. Doe claims the polices imposed were insufficient, which ultimately resulted in Doe being sexually assaulted by Evan and such negligence was foreseeable to MEF. Considering the allegations in the Complaint in the light most favorable to the non-moving party, I find the question of foreseeability is more appropriately an issue for a jury to decide.

Count 4: Negligent Performance of Undertaking to Render Services[189]

Delaware law allows a plaintiff to bring a claim under the theory of negligent performance of undertaking to render services when:

> one undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.[190]

The Delaware Supreme Court in *Jardel Co., Inc. v. Hughes* held that "a shopping mall owner could be liable for injuries sustained by a tenant's employee who was abducted in the mall parking lot and raped at a nearby location."[191] The *Jardel* Court

---

[189] The reader may notice that this decision does not address Count 3. Count 3 in the Complaint alleges negligence of MERB and Duley, and does not implicate MEF.

[190] Restatement (Second) of Torts § 323 (1965); *see Furek v. Univ. of Delaware*, 594 A.2d 506, 519 (Del. 1991).

[191] *Rogers v. Christiana School Dist.*, 73 A.3d 1, 8-9 (Del. 2013) (*citing Jardel*, 523 A.2d 518, 524 (Del. 1987)).

decided that the mall owner's decision to undertake and provide security required it to ensure the task was performed in a reasonable manner.[192] The critical question before the Court was "[what is] the extent of the danger which a landlord must reasonably foresee."[193] Moreover, the court in *Furek v. University of Delaware* held that "a university could be held liable for injuries sustained by a student in a fraternity hazing incident which occurred on university property."[194] The *Furek* Court found the defendant liable because the university was aware of the dangers and repetition of hazing occurring on campus and despite that awareness did nothing to intervene or prevent the incident.[195] A common factor between *Jardel* and *Furek* is that "liability could be imposed because the injury from a reasonably foreseeable harm occurred on the defendants' property."[196]

MEF argues that Doe's negligent performance claim cannot survive primarily on the bases that MERB, not MEF, undertook to provide the massage therapy services that gave rise to this litigation.[197] MEF further contends that the nature of the services undertaken were not those "that MEF 'recognized, or should have recognized, as necessary for the Plaintiff's protection.'"[198]

---

[192] *Rogers*, 73 A.3d at 9 (*citing Jardel*, 523 A.2d at 524).
[193] *Id*. (*citing Jardel*, 523 A.2d at 524).
[194] *Id*. (*citing Furek*, 594 A.2d at 520).
[195] *Id.* (*citing Furek*, 594 A.2d at 514, 522).
[196] *Id.*
[197] Def. Mot. to Dismiss, D.I. 103, at 2.
[198] *Id. see also Tollenaar v. Chino Valley Sch. Dist.*, 945 P.2d 1310, 1311 (Ariz. Ct. App. 1997).

Doe maintains MEF is subject to liability because it in fact did offer to render services for consideration and such services caused harm to Doe.[199] Doe states that she relied on MEF's promise to refrain from sexual misconduct when she consented to the massage.[200] Because MEF failed to provide services without adequate protection policies in place to protect its clients, Doe avers her claim should survive the motion to dismiss.[201]

When a party provides services to its client to secure that client's person or things, the party is held liable for failing to use reasonable care in such undertaking. There is no dispute that Doe paid to receive massage services at MERB on November 7, 2018. Both parties also agree that Doe filled out a general intake form and signed a general consent form prior to receiving her scheduled massage. Within the intake form and general consent Doe marked the areas of consent as: scalp, face, gluteal region, and feet. Doe did not consent to receiving a massage to her pectoral muscles or her abdominal area. Moreover, the general consent states that "[i]nappropriate or illegal conduct will not be tolerated in any manner." Doe

---

[199] Pl. Opp'n Resp., D.I. 109, at 27.
[200] *Id.* at 27-28.
[201] Doe relies on *Griffith v. Energy Independence, LLC.*, 2017 WL 6403509 (Del. Super. Ct. Dec. 13, 2017) to support its argument. *Griffith* denied a motion to dismiss where the plaintiff alleged defendants' renovations fell below the standard of reasonable care when the work was completed. The plaintiff ended up suing for breach of contract and tort for the damages she sustained, acquiring a mold-related lung disease. I find it important to note that, although Doe's claim might ought to survive the motion to dismiss stage, this claim seems to be on the fringe of cases for which this theory of recovery provides. *Id.* at 28.

submitted to the policies established by MEF when she received her scheduled massage with MERB and Evan. Doe alleged that she relied on the policies and procedures of MEF to be safe and free of harm while receiving services. Doe also has alleged facts that tend to show MEF and MERB are so intertwined that MEF can be held liable under this negligence theory. At this stage, I find Doe has adequately pleaded facts to support her claim of negligent performance of undertaking to render services.

Count 5: Negligent Misrepresentation

Under Delaware law, to assert a claim for negligent misrepresentation, the plaintiff must show the following elements: (1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information.[202]

MEF argues Doe cannot maintain her negligent misrepresentation claim because the Complaint fails to establish that MEF made any misrepresentations to her.[203] MEF also states Doe has not asserted she relied on any such misrepresentations.[204] To support its argument, MEF first asserts Doe fails to meet

---

[202] *Atwell v. RHIS, Inc.*, 2006 WL 2686532, at *1 (Del. Super. Ct. Aug. 18, 2006).
[203] Def. Mot. to Dismiss, D.I. 103, at 3.
[204] *Id.*

the heightened pleading standard for her negligent misrepresentation.[205] MEF claims that Delaware courts routinely apply the heightened pleading standard of Rule 9(b) to negligent misrepresentation claims.[206] Next, MEF asserts that Doe never pleaded specific facts regarding what statements MEF made, when she heard them, under what circumstances, and how she relied on them in order to survive dismissal.[207] Finally, MEF asserts Doe alleges no facts to suggest that MEF failed to exercise reasonable care in obtaining or communicating the alleged misrepresentations.[208]

Doe contends that the Complaint sufficiently establishes the elements of negligent misrepresentation.[209] Doe argues that throughout the Complaint she details statements made by MEF that its customers would be safe and free from inappropriate touching and that MEF knew these statements were false because MEF was aware of multiple instances of sexual assault at its locations nationwide.[210] Doe alleges that MEF made those statements with the expectation that Doe would rely on them when seeking services at MERB.[211] Doe specifically cites to the agreement

---

[205] *Id.* at 22.
[206] *Id. See Otto Candies, LLC v. KPMG, LLP*, 2019 WL 994050, at *7 (Del. Ch. Feb. 28, 2019) (holding that, although the Superior Court has considered the standard for pleading negligence on a case-by-case basis so long as the defendants were informed of the act plaintiff complained of, identified the materials or statements relied upon, identified the alleged misrepresented contained within the materials or statements, and identified who prepared or disseminated the materials or statements, that it is routine for Delaware courts to apply the more stringent Rule 9(b) standard).
[207] Def. Mot. to Dismiss, D.I. 103, at 24.
[208] *Id.* at 25.
[209] Pl. Opp'n Resp., D.I. 109, at 28.
[210] *Id.*
[211] *Id.*

she entered into with MERB, which stated massage therapists would not touch certain areas of her body and that she would be free from harm during her massage.[212]

The Complaint clearly depicts the elements required to set forth a negligent misrepresentation claim. Indeed, Doe entered a services contract with MERB and/or MEF for services which tends to establish there was a pecuniary interest to provide accurate information as it related to the contract. It is also alleged that MEF and/or MERB's business practices were to conceal sexual assault allegations and prevent the public from being on notice of issues at individually owned and operated Massage Envy locations. Because of the operations policies and procedures implemented by MEF, Doe alleges MEF should have been aware when the statements were made that they were false. Further, MEF made such statements to induce Doe into entering into the agreement for services to her detriment. The fourth element of pecuniary loss may pose some concern at later stages in this litigation because of the nature of Doe's loss. When viewing the facts in the light most favorable to the non-moving party, however, and drawing all reasonable inferences in favor of Doe, I find that Doe has pleaded facts sufficient to support her claim of negligent misrepresentation to survive the motion to dismiss.

---

[212] *Id.* at 28-29; *see also* Am. Compl. ¶¶38-40, 144-48.

Count 6: Delaware Consumer Fraud Act

A plaintiff must allege the following elements when asserting a private cause of action for damages under the Delaware Consumer Fraud Protection Act ("DCFPA"): (1) a defendant engaged in conduct which violated the statute, (2) the plaintiff was a "victim" of the unlawful conduct, and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss.[213] 6 *Del. C.* §2513(a) states:

> The act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease, receipt, or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is an unlawful practice.

Where the plaintiff alleges fraud in connection with the advertisement or sale of services, goods, or otherwise, the claim can survive the challenge of a motion to dismiss.[214]

MEF argues that the DCFPA count of Doe's Complaint should be dismissed because Doe contractually agreed to only bring claims under Arizona law and because she failed to plead any violation of the DCFPA with requisite specificity.[215]

---

[213] *State v. ex rel. Jennings, v. BP America, Inc.*, 2024 WL 98888, at *19 (Del. Super. Ct. Jan. 9, 2024) (*citing Teamsters Loc. 237 Welfare Fund v. AstraZeneca Pharmaceuticals LP*, 136 A.3d 688, 693 (Del. 2016)).

[214] *See generally Peterson v. 21ˢᵗ Century Centennial Ins. Co.*, 2015 WL 4154070, at *5-6 (Del. Super. Ct. July 9, 2015).

[215] Def. Mot. to Dismiss, D.I. 103, at 3.

MEF argues that to meet the heightened requirement governing allegations of fraud, a plaintiff must specify the time, place, and contents of the false representations, as well as the identity of the person or persons making those representations.[216]

Doe contends Delaware law, not Arizona law, applies to the claims brought against MEF because the arbitrator found the Terms of Use Agreement to be unconscionable and therefore invalid.[217] Doe argues the Complaint satisfies the pleading standard.[218] To support her argument, Doe points out that the Complaint expressly states MEF committed an unfair or deceptive practice as defined by the DCFPA as a misrepresentation.[219] Further, that MEF intentionally deceived or misled Doe by making knowingly false statements, specifically by warranting the quality and scope of its services, promising a safe environment, failing to disclose material information regarding the known risks posed by massage therapist, and by promising that customers will not be touched inappropriately at any point during their service.[220]

When a plaintiff identifies the who, what, when, and where within their allegation of fraud, the heightened pleading standards of Rule 9(b) are satisfied. Here, Doe identifies MEF as the speaker of the misrepresentation when its intake

---

[216] Def. Mot. to Dismiss, D.I. 103, at 27; *Rinaldi*, 1999 WL 1442014, at *7-8.
[217] Doe argues that the arbitrator found the Terms of Use Agreement invalid and, thus, the choice of law inapplicable. Pl. Opp'n Resp., D.I. 109, at 29.
[218] *Id.* at 30-31.
[219] *Id.*
[220] *Id.* at 31.

forms stated the massage would be conducted safely. Doe maintains throughout her Complaint that MEF had implemented policies and procedures that channeled sexual assault and misconduct complaints from customers directly to MEF to handle and conceal from the public. Doe alleges this concealment led to local authorities or other agencies failing to be informed of any dangers at independently owned and operated Massage Envy locations. Throughout her Complaint, Doe alleges that she consented to certain body parts being massaged during her massage. She also alleges signing a general consent form which stated male or female genitalia would not be touched or exposed during service. Finally, Doe expressly states in her Complaint that these omissions, practices, and policies, proximately caused Doe to suffer because, had she had been informed of the potential dangers, she would not have purchased the massage at Massage Envy. Drawing all reasonable inferences from the well-pleaded facts in the Complaint and considering these arguments in the light most favorable to the non-moving party, I find Doe has satisfied the pleading standard for her claims under the DCFPA.

Count 7: Fraudulent Concealment

A plaintiff must show the following to support a claim for fraudulent concealment: (1) deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak, (2) the defendant acted with

scienter, (3) an intent to induce the plaintiff's reliance upon the concealment, (4) causation, and (5) damages resulting from the concealment.[221]

MEF argues Doe's claim for fraudulent concealment fails because she has not pleaded the required elements with the requisite specificity required by Delaware Superior Court Civil Rule 9(b).[222] MEF also claims Doe does not allege facts to establish MEF had a duty to disclose.[223] MEF suggests Doe only makes conclusionary assertions and has not pointed to any factual allegation to support her claims.[224] More specifically, MEF states Doe "fails to plead: (1) some affirmative and deliberate actions showing that MEF actively concealed a material fact; (2) that MEF knew such fact was being concealed; and (3) that Plaintiff relied on MEF's concealment."[225]

Doe counters that she has sufficiently pleaded her fraud causes of action throughout her Complaint.[226] Doe states the Complaint alleges MEF falsely represented the safety of its business practices, that the misrepresentations were made with the intention that clients would act upon them by procuring services, and that these misrepresentations did in fact cause Doe to become a client of Massage

---

[221] *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).
[222] Def. Mot. to Dismiss, D.I. 103, at 2, 28.
[223] *Id.* at 30.
[224] *Id.* at 29.
[225] *Id.* MEF relies on Arizona case law to support this argument. *See Hearn v. R.J. Reynolds Tobacco Co.*, 279 F. Supp. 2d 1096, 1114 (D. Ariz. 2003).
[226] Pl. Opp'n Resp., D.I. 109, at 31.

Envy, which resulted in her being harmed.[227] Doe cites to the Delaware Superior Court's decision in *Lecates v. Hertrich Pontiac Buick Co.* which held the plaintiff must show there was some actual trick or artifice to prevent knowledge of the fact or inquiry, and some affirmative act of concealment.[228] Doe contends her allegation—that there have been prior sexual assault allegations suppressed by MEF and its agents through its policies and procedures of channeling claims in-house and refusing to disclose them to the proper authority—evinces such a trick or concealment described in *Lecates*.[229]

In the present matter, Doe has satisfied the particularity requirement in that she has pleaded the time, place, and contents of the alleged fraud. The problem for Doe, however, is that when she checked in for her massage, the sexual assault had not happened. Therefore, there was nothing for MEF to conceal in Doe's particular incident. Doe's claim that sexual assaults were covered up my MEF's policies on handling those assaults is far too attenuated from her own experience for this claim to survive. Therefore, Doe's claim for fraudulent concealment is dismissed.

Count 8: Conspiracy

---

[227] *Id.* at 32; *see also* Am. Compl. ¶¶ 36-42, 97-109, 160-70.

[228] Pl. Opp'n Resp., D.I. 109, at 32; *see Lecates*, 515 A.2d 163, 176 (Del. Super. Ct. 1986).

[229] *Id*; Am. Compl. ¶ 29; *see Lecates*, 515 A.2d at 176.

To establish a valid claim for civil conspiracy under Delaware law, a plaintiff must prove: "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[230] In Delaware, "civil conspiracy is not an independent cause of action…it must arise from some underlying wrong."[231] A conspirator is jointly and severally liable for the acts of co-conspirators committed in furtherance of the conspiracy.[232]

The Supreme Court of Delaware held in *In re Asbestos Litigation* that if there is competent medical evidence as to the dangers of asbestos intentionally misrepresented and suppressed in order to cause the plaintiff to remain ignorant thereof, and actual injury resulting from the misrepresentation, the alleged tort is established.[233] The Court likewise applied this rationale in *Nicolet, Inc. v. Nutt*, rejecting the defendant's motion for summary judgment on the civil conspiracy claim.[234] *Nutt* held the plaintiff did establish an independent tort of fraudulent concealment as required to provide the basis for her claim.[235] The court noted the *active* steps taken by the defendant to suppress and conceal the hazards of exposure

---

[230] *Nutt*, 525 A.2d 146, 149-50 (citation omitted).
[231] *Ramunno v. Cawley*, 705 A.2d 1029, 1030 (Del. 1998).
[232] *Nutt*, 525 A.2d at 150 (citation omitted).
[233] *Id.* at 147; *see also In re Asbestos Litigation*, 509 A.2d 1116 (Del. Super. Ct. 1986).
[234] *Nutt*, 525 A.2d at 150.
[235] *Id.* Although, negligence is not a claim to which a civil conspiracy claim can survive. Therefore, if at some point during this litigation the claims of fraud are disposed of, the civil conspiracy claim cannot survive. *See also Szczerba*, 2016 WL 1424561, at *7 n.31 (Del. Super. Ct. Apr. 1, 2016) (citation omitted).

to asbestos.[236] Such steps attached liability as a result of the active misconduct and the complaint did establish the defendant could be considered a member of the conspiracy.[237]

MEF argues that because Doe's fraud claim fails, Doe's civil conspiracy claim cannot be maintained because it is not supported by an actionable underlying tort claim.[238] MEF also argues Doe cannot support the conspiracy claim because she alleges that MEF controls MERB and other defendants through agency, and civil conspiracy requires separate persons or actors.[239] To support its argument, MEF submits the Complaint does not allege that an injury occurred as a result of specific overt acts that were committed pursuant to the conspiracy.[240] Moreover, MEF asserts that Doe fails to plead civil conspiracy with specificity as required under Delaware law.[241]

Doe counters that the three elements required to raise a successful civil conspiracy claim have been sufficiently pleaded in her Complaint.[242] In support of her argument, Doe submits fraud, negligent misrepresentation, and concealment

---

[236] *Id.* (emphasis included).
[237] *Id.*
[238] Def. Mot. to Dismiss, D.I. 103, at 3.
[239] *Id.* at 3-4, 32-33; *see Amaysing Techs. Corp. v. Cyberair Commun., Inc.*, 2005 WL 578972, at *7-8 (Del. Ch. Mar. 3, 2005) (holding that corporations cannot conspire with its agents).
[240] *Id.* at 30-31 (*citing Perry v. Apache Junction Elementary Sch. Dist. No. 43 Bd. of Trustees*, 514 P.2d 514, 517 (Ariz. App. 2d Div. 1973)).
[241] *Id.* at 31; *see In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 805 (Del. Ch. 2009) (stating both fraud and a conspiracy to commit fraud must be alleged with particularity).
[242] Pl. Opp'n Resp., D.I. 109, at 33.

have all been satisfactorily pleaded, which would support the civil conspiracy claim. Doe also argues the complaint alleges the formation and operation of a conspiracy to protect the brand against claims of sexual assault occurrences among its franchisees and regional developers.[243] Moreover, Doe notes the Complaint alleges that MEF and its agents did not warn customers of any known prior assaults committed by MEF therapists, but rather actively concealed them through policy and internal regulations.[244] Doe suggests these efforts ultimately led to her injuries from the sexual assault.[245]

Under Delaware law, a corporation cannot conspire with its own agents. However, where the officer or agent of the corporation steps out of her existing role as an officer or agent and acts pursuant to personal motives, a conspiracy can still be found to exist. Doe alleges MEF and its agents were in a conspiracy to conceal sexual assault allegations from her and the public, but whether an agency relationship exists between the parties has yet to be determined. The agency theory is a factual question that must be developed through discovery. Here, the allegations in the Complaint allow an inference that MEF took steps in cohort with DDW, MERB, and/or Duley to conceal information to protect the Massage Envy brand. In turn, the alleged

---

[243] *Id.* at 33-34.
[244] *Id.* at 34.
[245] *Id.*

concealment is what Doe asserts led to the injuries suffered from the sexual assault. Therefore, I deny MEF's motion to dismiss this count in Doe's Complaint.

Count 9: Negligence Per Se

Under Delaware law, "a violation of a statute enacted for the safety of others constitutes negligence per se."[246] The basis for the claim must be derived from Delaware common law "as the repository for the creation of a cause of action based on negligence per se."[247] Doe bases her negligence per se claim on violations of two statutes: (i) the Delaware criminal code, specifically the crimes of offensive touching and unlawful sexual contact, and (ii) the statute creating the Board of Massage and Bodywork ("Board of Massage") and requiring the Board to promulgate regulations, specifically Board Rule 11.3 (by permitting or failing to report Evan's conduct) and Board Rule 12.4 (by failing to have a professional in charge).

MEF argues Doe's negligence per se claim should fail because she does not adequately allege that MEF violated any law or regulation that proximately caused her injury.[248] MEF suggests the claim is predicated upon the criminal action of Evan—who is not an agent of MEF—thus the claim fails due to lack of relation

---

[246] *Fanean v. Rite Aid Corp. of Delaware, Inc.*, 984 A.2d 812, 823 (Del. Super. Ct. 2009) (citation omitted).
[247] *Id*. at 823-24.
[248] Def. Mot. to Dismiss, D.I. 103, at 4, 33.

between MEF and Evan.[249] Moreover, MEF suggests, *arguendo*, that if an agency theory is applied, Doe's Complaint fails to purport how MEF's failure to report Evan's misconduct to the board was the proximate cause of her injuries.[250] MEF maintains the reportable conduct occurred *after* the alleged violation, which could not have been the violation causing her injury.[251]

Doe purports a four-part showing is required to maintain a negligence per se claim.[252] First, Doe contends that the laws and regulations apply to MEF as related to the vicarious liability established through the alleged agency relationship between MEF and its actors.[253] She suggests MEF took control of so many of the day-to-day operations through the implementation of the Franchise Agreement and Operations Manual to support this argument.[254] Second, Doe claims there were in fact criminal violations and violations of board regulations which caused her to suffer injuries as a result of those violations.[255] In her Complaint, Doe expressly cites to the Board of

---

[249] *Id.* at 33.
[250] *Id.* at 34.
[251] *Id.* (emphasis added).
[252] "First, the plaintiff must show that the statute in question was enacted for the safety of others. Plaintiff must also show a causal connection between the statutory violation and the injury, and, that he was a member of the class of persons the statute set out to protect. In addition, the plaintiff must show that the statute set forth a standard of conduct which was designed to avoid the harm plaintiff suffered. Finally, the plaintiff must show that the defendant violated the statute by failing to comply with that standard of conduct." *NVF Co. v. Garret Snuff Mills, Inc.*, 2002 WL 130536, at *2 (Del. Super. Ct. Jan. 30, 2002).
[253] Pl. Opp'n Resp., D.I. 109 at 35.
[254] *Id.*
[255] *Id.* at 35-36.

Massage and Bodywork's rules and regulations, Board Rule 12.4, 11.2 and 11.3:[256]

- 12.4 Professional-in-charge.
    - 12.4.2 At all times, the massage establishment's professional-in-charge shall be a Delaware licensed massage therapist or certified massage technician with a license in good standing.
    - 12.4.4 The professional-in-charge is responsible for ensuring that all licensees proving massage services at the massage establishment comply with the Board's Practice Act, Chapter 53 of Title 24 of the Delaware Code, and regulations.
    - 14.4.6 The professional-in-charge shall not allow, authorize or tolerate any activity or behavior prohibited by the laws of this State, including such laws proscribing acts of or promotion of prostitution, indecent exposure, lewdness or obscenity or any of the criminal code violations set forth in Section 14.0.
- 11.2 A licensee shall not:
    - 11.2.2 Knowingly engage in or condone behavior that is fraudulent, dishonest, or deceitful or involves moral turpitude.
    - 11.2.3 Psychologically or physically abuse a client.
    - 11.2.4 Violate a client's boundaries with regard to exposure, privacy or disclosure.
    - 11.2.7 Intentionally expose a client's genitals, gluteal cleft or the breasts of a female client.
    - 11.2.8. Engage in sexual harassment, sexual impropriety, sexual violation or sexual abuse.
    - 11.2.9. Engage in sexual intimacies during the professional relationship.
- 11.3 Any licensee who has knowledge that another licensee has violated the Standards of Professional Conduct set forth in section 11.0, or any other Board law, Rule or Regulation, shall present that information by complaint to the Division of Professional Regulation for investigation.

Doe claims these rules and regulations were clearly established to protect from the harm she suffered and that MEF was in violation of one or more of the Board Rules

---

[256] *Id. See also* Am. Compl. ¶¶ 9-12, 180-83; 20 DE Reg. 825 (Apr. 2017).

which led to her harm.[257]

### A. Criminal Offenses

To determine whether the General Assembly intended to create a civil remedy in addition to a criminal penalty for a violation of law, Delaware courts consider a three-part test: (1) is the plaintiff one of the class for whose *especial* benefit the statute was created, (2) is there any indication of legislative intent either to create or deny a civil remedy, and (3) is it consistent with the underlying purposes of the legislative scheme to imply a civil remedy for the plaintiff?[258]

The crimes of offensive touching and unlawful sexual contact were enacted to protect the general public, not a particular class. Furthermore, Doe is not a member of any particular class that the general assembly intended to protect by making offensive touching and unlawful sexual contact a crime. Therefore, Doe cannot maintain a negligence per se claim based on these two alleged Title 11 violations.

### B. The Board's regulations

Not all licensing statutes were enacted for the protection of others.[259] Title 24,

---

[257] Pl. Opp'n Resp., D.I. 109 at 36.

[258] *Desmond v. Lucks*, 1988 WL 90500, *2 (Del. Super. Ct. Aug. 19, 1988).

[259] *See, e.g.*, *Tydings v. Loewenstein*, A.2d 443 (Del. 1986) (holding that licensing statutes found in 24 *Del. C.* § 2701 (that licenses surveyors) do not define a standard of care and a violation of those statutes cannot support a claim of negligence per se). But see, *Cunningham v. Kentmere Rehabilitation and Healthcare*, 2021 WL 1157991, at *5 (noting, "*Tydings* did not hold that a licensing statute could never form the basis of negligence per se.").

58

Chapter 53 of the Delaware Code, however, authorizes the Board of Massage and Bodywork to establish rules and regulations which are binding authority on the profession. When a violation of a statutory or common law rule or regulation enacted for the safety of others occurs, and said violation causes injury to another, a claim based on the theory of negligence per se can be established. 24 *Del. C.* § 5301 (titled "Objectives") states: "The primary objective of the Board of Massage and Bodywork, *to which all other objectives and purposes are secondary*, is to protect the general public, *specifically those persons* who are the direct recipients of services regulated by this chapter, from unsafe practices . . ."[260] This statutory language clearly establishes that the Board's regulations are intended to protect patrons of massage services, and can therefore be the basis of a negligence per se claim. Doe has pleaded sufficient facts supporting a claim that there was a violation of the Board of Massage and Bodywork's rules and regulations, that Doe was a member of the class the rules were designed to protect, and alleged violations of the rule(s) above could have proximately caused her injuries.

When viewing the facts in the light most favorable to the non-moving party and making all reasonable inferences in favor of Doe through the well-pleaded facts in her Complaint, I grant MEF's motion to dismiss the negligence per se claim as it relates to violations of the criminal code and deny MEF's motion to dismiss Doe's

---

[260] 24 *Del. C.* § 5301 (emphasis added).

59

negligence per se claim as it relates to any violation of the Board's regulations.

<u>Count 10: Negligent Infliction of Emotional Distress</u>

To maintain a claim of negligent infliction of emotional distress ("NIED") under Delaware law, a plaintiff must establish three elements.[261] The complaint must (1) allege negligence causing fright to someone, (2) that the plaintiff was within the "zone of danger," and (3) that the plaintiff suffered physical harm as a result.[262] It must be pleaded that the defendant owed and breached a duty to the plaintiff.[263] The plaintiff must show she not only suffered mental stress from the negligence, but also bodily injury or sickness.[264]

MEF argues Doe's claim of NIED fails because she does not allege any sufficiently outrageous conduct by MEF that caused her actionable harm.[265] First, MEF submits that there was no alleged conduct that MEF should have known would cause Doe's claimed emotional distress.[266] Further, MEF states Doe fails to allege

---

[261] *Spence v. Cherian*, 135 A.3d 1282, 1289-90 (Del. Super. Ct. 2016) (citations omitted).
[262] *Id.*
[263] *Id.*
[264] *Lupo v. Medical Ctr. Of Delaware, Inc.*, 1996 WL 111132, at \*2 (Del. Super. Ct. Feb. 7, 1996) (citations omitted) (holding that the case was distinguishable from those emotional distress cases when an injury to a third person caused a plaintiff mental anguish or where a sudden, unexpected incident caused a plaintiff fright or shock. Rather, in *Lupo*, the plaintiff allegedly suffered direct injuries due to the negligence of the defendants. The court found this requires physical injuries as a result of the negligent act.).
[265] Def. Mot. to Dismiss, D.I. 103, at 4.
[266] *Id.* at 35.

physical injuries that resulted from her emotional distress as required by law.[267] MEF argues Doe's allegations are too conclusory and devoid of any factual allegations to show a physical injury resulted from her emotional distress.[268]

In her brief, Doe maintains that she did suffer from physical manifestations of her emotional distress.[269] Doe contends her allegation that she was frozen and unable to move as a result of Evan's assault is sufficient.[270] Moreover, Doe claims the psychological and psychiatric injuries caused by the assault manifested into physical injuries.[271] Doe states her pleading burden has been met for this claim and asks MEF's motion be denied.[272]

The Complaint alleges that all defendants, including MEF, committed multiple acts that "caused severe emotional, psychological, and psychiatric injuries, distress, and harm to Plaintiff, which also manifested in physical injuries to Plaintiff as set forth above . . . ."[273] The NIED claim in the Complaint itself, however, is silent as to where exactly those physical injuries are set forth in the Complaint. In her brief, Doe cites to language in Paragraphs 80, 93, and 114 of the Complaint.[274] Paragraph 80 only mentions that Doe "felt frozen" as the assault took place. Paragraph 93

---

[267] *Id.* at 35-36.
[268] *Id. See also* Def. Mot. to Dismiss, D.I. 103, at 36.
[269] Pl. Opp'n Resp. D.I. 109 at 36-37.
[270] *Id.* at 37; *see also* Am. Compl. ¶ 80.
[271] Pl. Opp'n Resp. D.I. 109 at 37. *See e.g.* Am. Compl. ¶ 93.
[272] Pl. Opp'n Resp. D.I. 109 at 37.
[273] Am. Compl. ¶ 186.
[274] Pl. Opp'n Resp. D.I. 109 at 37.

alleges that Doe suffered "great pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation and loss of enjoyment of life" that resulted in her inability to perform daily activities and loss of earning capacity. Other than correcting several grammatical errors, Paragraph 114 contains identical language to that of Paragraph 93. These conclusory and non-specific allegations are not sufficient to constitute bodily injury for a claim of NIED. Therefore, MEF's motion to dismiss this count is granted.

## CONCLUSION

For the reasons stated above MEF's motion to dismiss as to Counts 7 (fraudulent concealment) and 10 (negligent infliction of emotional distress) is GRANTED, and is DENIED as to all other counts. Because many of Doe's claims survive the motion to dismiss, MEF's motion to dismiss the cross claims is DENIED.

**IT IS SO ORDERED.**

62